GUILLERMO AILLON *v.* LARRY R. MEACHUM,
COMMISSIONER OF CORRECTION
(13542)

PETERS, C. J., SHEA, CALLAHAN, COVELLO and HULL, Js.

Argued January 10—decision released May 30, 1989

*John R. Williams,* for the appellant (petitioner).

*Julia DiCocco Dewey,* assistant state's attorney, with whom, on the brief, was *Stephanie Watkins,* legal intern, for the appellee (respondent).

HULL, J. The sole issue on this appeal is whether the petitioner, Guillermo Aillon, has established that his convictions on three counts of murder in violation of General Statutes § 53a-54[1] should be overturned because of ineffective assistance of counsel. We conclude that the trial court properly rejected the petitioner's claims that the legal representation he received at his third trial was constitutionally deficient and, therefore, find no error.

The long history of events leading up to the present appeal may be summarized as follows. The petitioner was charged with three counts of murder alleged to have occurred on August 14, 1972. The charges against the petitioner arose out of the stabbing deaths of George Montano, his wife, Bernice Montano, and their daughter, Barbara Aillon, the petitioner's estranged wife, in the Montanos' home in North Haven. The petitioner was tried on these charges in 1973 and convicted by a jury, but he was granted a new trial because of an improper ex parte conversation between the trial court and a member of the jury. *Aillon* v. *State,* 173 Conn. 334, 339–40, 377 A.2d 1087 (1977). The peti-

---

[1] General Statutes (Rev. to 1972) § 53a-54 provides in relevant part: "MURDER DEFINED. AFFIRMATIVE DEFENSES. EVIDENCE OF MENTAL CONDITION. CLASSIFICATION. (a) A person is guilty of murder when: (1) With intent to cause the death of another person, he causes the death of such person or of a third person or causes a suicide by force, duress or deception; except that in any prosecution under this subsection, it shall be an affirmative defense that the defendant acted under the influence of extreme emotional disturbance for which there was a reasonable explanation or excuse, the reasonableness of which is to be determined from the viewpoint of a person in the defendant's situation under the circumstances as the defendant believed them to be, provided nothing contained in this subdivision shall constitute a defense to a prosecution for, or preclude a conviction of, manslaughter in the first degree or any other crime . . . . "

tioner's second trial, in 1978, ended in a mistrial when the jury was unable to reach a verdict. Thereafter, the petitioner filed a motion for judgment of acquittal arguing that his retrial was barred by double jeopardy. That claim was twice rejected by this court. *State v. Aillon*, 189 Conn. 416, 421–22, 456 A.2d 279, cert. denied, 464 U.S. 837, 104 S. Ct. 124, 78 L. Ed. 2d 122 (1983); *State v. Aillon*, 182 Conn. 124, 130–31 n.5, 137–38, 438 A.2d 30 (1980), cert. denied, 449 U.S. 1090, 101 S. Ct. 883, 66 L. Ed. 2d 817 (1981). In March, 1984, approximately four months prior to the commencement of the petitioner's third trial, the attorney who had represented the petitioner in his first two trials, Howard Jacobs, withdrew from the case.[2] New counsel from the public defender's office, Donald Dakers and Kenneth Rosenthal, were appointed to represent the petitioner in his third trial. They entered their joint appearances on behalf of the petitioner on March 22, 1984. Dakers was primary trial counsel. Rosenthal was his assistant.

Jury selection for the petitioner's third trial commenced on July 23, 1984. On September 21, 1984, the jury found the petitioner guilty as charged of three counts of murder in violation of General Statutes § 53a-54. The trial court, *Hadden, J.*, sentenced him to three consecutive terms of imprisonment of twenty-five years to life. This judgment was upheld on direct appeal. *State v. Aillon*, 202 Conn. 385, 521 A.2d 555

---

[2] Attorney Jacobs' withdrawal from the case was apparently prompted by a habeas corpus petition filed by the petitioner in November, 1983, alleging ineffective assistance of counsel on the part of attorney Jacobs because he "had failed to claim 'that actions of the Court . . . during his first trial in 1973 constituted judicial misconduct foreclosing "the petitioner's right to have his guilt or innocence determined by the particular tribunal summoned to sit in judgment on him." ' " *Aillon* v. *Manson*, 201 Conn. 675, 679–80, 519 A.2d 35 (1986). The petitioner also filed a second petition for a writ of habeas corpus in August, 1984, again claiming ineffective assistance of counsel on the part of attorney Jacobs because he had allegedly "failed to raise, in a timely fashion, a valid double jeopardy claim." Id., 683 n.6. We upheld the dismissal of both petitions in *Aillon* v. *Manson*, supra.

(1987). On November 5, 1987, the petitioner filed a petition for a writ of habeas corpus alleging inadequate representation on the part of his counsel in the third trial. After an evidentiary hearing, the trial court, *Fracasse, J.,* issued a memorandum of decision on June 17, 1988, denying the petitioner's claims for relief and dismissing the petition. The petitioner appeals from that judgment.

The gravamen of the petitioner's claim on appeal is that he received ineffective assistance of counsel under our federal and state[3] constitutions at his third trial

---

[3] The petitioner contends that his right to counsel under article first, § 8, of the Connecticut constitution affords him "greater and more extensive rights to counsel" than its federal counterpart contained in the sixth amendment to the United States constitution, and that the burden for demonstrating ineffective assistance of counsel under our state constitution is therefore less than that required under the federal constitution. We find no merit to this claim. We have consistently cited with approval the prevailing federal constitutional standard for review of ineffective assistance of counsel claims contained in *Strickland* v. *Washington,* 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674, reh. denied, 467 U.S. 1267, 104 S. Ct. 3562, 82 L. Ed. 2d 864 (1984), without ever once indicating that the protection afforded by our state constitution imposes a different standard for review of such claims. See, e.g., *Valeriano* v. *Bronson,* 209 Conn. 75, 85, 546 A.2d 1380 (1988); *Nardini* v. *Manson,* 207 Conn. 118, 124, 540 A.2d 69 (1988); *Herbert* v. *Manson,* 199 Conn. 143, 145, 506 A.2d 98 (1986); *State* v. *Tirado,* 194 Conn. 89, 92, 478 A.2d 606 (1984).

The only authority cited by the petitioner in support of the proposition that the rights afforded him under our federal and state constitutions are distinguishable with respect to an ineffective assistance of counsel claim is *State* v. *Stoddard,* 206 Conn. 157, 537 A.2d 446 (1988), which we find inapposite. In *Stoddard,* the issue was whether the police are constitutionally required to inform a suspect whom they are holding for custodial interrogation of timely efforts by counsel to render pertinent legal assistance. We acknowledged in that case that the United States Supreme Court had previously determined that the federal constitution imposes no such duty upon the police. See *Moran* v. *Burbine,* 475 U.S. 412, 422, 106 S. Ct. 1135, 89 L. Ed. 2d 410 (1986). Nevertheless, we held that the due process clause of the Connecticut constitution provides broader protection in this area than its federal counterpart and requires that a suspect be so informed. The focus in *Stoddard* on when the right to counsel attaches, however, has not the slightest bearing on the standard to be employed in assessing an ineffec-

because his trial counsel lacked sufficient time to prepare an adequate defense. Specifically, the petitioner contends that his counsel's representation was constitutionally inadequate in that they: (1) failed to obtain a hair identification expert to rebut the testimony given by the state's hair identification experts; (2) failed to prepare properly for the cross-examination of witnesses; (3) failed to interview properly an important defense witness before she presented her trial testimony; (4) failed adequately to prepare the petitioner for his trial testimony; and (5) failed to obtain a lesser included offense charge.[4]

---

tive assistance of counsel claim under either our federal or state constitutions. Accordingly, we conclude that the state and federal constitutional standards for review of ineffective assistance of counsel claims are identical.

[4] The petitioner in his habeas petition alleged that his counsel's lack of time to prepare was due in considerable part to the trial court's unwillingness to grant his counsel's requests for continuances. In his brief to this court, however, the petitioner appears to shift the blame for the lack of time to prepare to his attorneys, claiming that his "[c]ounsel failed to request continuances even though counsel realized at an early stage that they lacked enough time to prepare a competent defense." If the petitioner is advancing this as a separate basis in support of his claim of ineffective assistance of counsel, we find that it is clearly refuted by the record, which discloses that petitioner's counsel did in fact request two continuances or extensions of time for purposes of additional preparation, both of which were granted by the court.

Also, in his habeas petition, the petitioner alleged improper jury voir dire on the part of his counsel. The trial court found no merit to this claim. In his brief to this court, the petitioner asserts that attorney Dakers "did no research or preparation concerning jury selection." The petitioner, however, has not developed this claim either in his brief or in oral argument before us. " 'Assignments of error which are merely mentioned but not briefed beyond a statement of the claim will be deemed abandoned and will not be reviewed by this court. *Cheney* v. *Strasburger*, 168 Conn. 135, 142, 357 A.2d 905 (1975); Maltbie, Conn. App. Proc. § 327; see *Hartford National Bank & Trust Co.* v. *Tucker*, 178 Conn. 472, 475, 423 A.2d 141 (1979). This also applies to constitutional claims. *Mazur* v. *Blum*, 184 Conn. 116, 120, 441 A.2d 65 (1981); *Hartford Electric Light Co.* v. *Water Resources Commission*, 162 Conn. 89, 108-109, 291 A.2d 721 (1971).' *Rodriguez* v. *Mallory Battery Co.*, 188 Conn. 145, 149, 448 A.2d 829 (1982)." *Hayes* v. *Smith*, 194 Conn. 52, 66 n.12, 480 A.2d 425 (1984).

"A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction . . . has two components. First, the defendant must show that counsel's performance was deficient. . . . Second, the defendant must show that the deficient performance prejudiced the defense. . . . Unless a defendant makes both showings, it cannot be said that the conviction . . . resulted from a breakdown in the adversary process that renders the result unreliable." *Strickland* v. *Washington,* 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674, reh. denied, 467 U.S. 1267, 104 S. Ct. 3562, 82 L. Ed. 2d 864 (1984). With regard to the performance component of this inquiry, "the defendant must show that counsel's representation fell below an objective standard of reasonableness." Id., 687–88. Further, the test for prejudice requires that "[t]he defendant . . . show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id., 694; see also *Nardini* v. *Manson,* 207 Conn. 118, 124, 540 A.2d 69 (1988); *Herbert* v. *Manson,* 199 Conn. 143, 145, 506 A.2d 98 (1986); *State* v. *Tirado,* 194 Conn. 89, 92, 478 A.2d 606 (1984).

The complexity of the petitioner's case cannot be overstated. He had been tried twice before on the same charges without a final resolution of the case. Four separate appeals had been taken by the petitioner since his first trial. Dozens of witnesses had testified at the first two trials and hundreds of exhibits had been introduced into evidence. The materials from the first two trials that needed to be reviewed prior to the petitioner's third trial, everything from trial transcripts to police statements, were voluminous.

Preparation by Dakers and Rosenthal for the petitioner's third trial began in earnest in early May, 1984,

when they secured from his former attorney the bulk of the files from the petitioner's first two trials, including the transcripts from those trials.[5] Counsel divided up trial preparation responsibilities. Rosenthal's efforts were focused primarily on drafting pretrial motions and memoranda and organizing the materials contained in the files from the earlier trials. As lead counsel,[6] Dakers spent most of his time reviewing the materials in those files, including the transcripts from the petitioner's first two trials. The record reveals that the petitioner's counsel filed an exhaustive number of pretrial motions and memoranda covering all aspects of the petitioner's case.[7] Rosenthal did most of the work on the pretrial

---

[5] The petitioner's counsel testified that some portions of the second trial transcript were missing from Jacobs' files and that that transcript was assembled piecemeal over the course of several weeks. Although the completed transcript was eventually secured by counsel, the petitioner's counsel testified that an inordinate amount of time was spent gathering and organizing the transcript of the second trial.

[6] The testimony of Dakers, the petitioner's primary trial counsel, discloses that at the time he undertook to represent the petitioner in 1984, he was a highly experienced criminal defense attorney. Dakers graduated from law school in 1962. In 1976, he joined the public defender's office as a full-time assistant public defender. In 1981, he became the public defender for the judicial district of New Haven county and held that position throughout his representation of the petitioner in 1984. Dakers testified that he had brought "at least a hundred" criminal felony cases to trial prior to his representation of the petitioner.

Rosenthal testified that he graduated from law school in 1978 and worked primarily in civil litigation until August, 1982, when he joined the public defender's office. As a member of the public defender's office in March, 1984, he was appointed, along with Dakers, to represent the petitioner in his third trial.

[7] On May 21, 1984, the petitioner's counsel filed with the court the following motions: motion for continuance, motion to supress statements, motion to supress evidence, motion to supress identification, motion for disclosure of uncharged misconduct, motion to exclude public, motion for evidentiary hearings, motion to transfer, motion to stay proceedings, motion for discovery and inspection, motion to reconsider and extend time to file pretrial motions, and motion to dismiss. On June 6, 1984, counsel for the petitioner filed an amended motion to dismiss, and on June 8, 1984, they filed a thirteen page memorandum in support of the amended motion to dismiss. On June 14, 1984, the petitioner's counsel filed with the court the

motions, including a complex double jeopardy claim wherein he attempted to secure dismissal of all charges against the petitioner. Dakers testified that he spent "every waking minute" working on the case; he examined all the physical evidence and exhibits, surveyed the crime scene, and reviewed transcripts and other materials contained in the files from the prior two trials. Despite the seemingly diligent efforts put forth by counsel on his behalf, the petitioner claims, and Dakers and Rosenthal so testified at the habeas hearing, that due to a lack of time to prepare[8] they failed to render an adequate defense of the petitioner at his third trial in several respects.

The petitioner first claims that his counsel were deficient in failing to secure an expert to rebut the testimony given by the state's hair identification experts. A proper understanding of this claim requires some further discussion. At each of the petitioner's three trials, one of the links between the petitioner and the murders was hair that was found on the bloody bedsheets and blanket in the bedroom of one of the victims. The state

following additional motions: motion to extend time to file pretrial motions, motion for advance disclosure of order of witnesses, motion for permission to inspect tangible and scientific evidence, motion for continuance, and motion to exclude television cameras. In the two weeks preceding the commencement of jury selection on July 23, 1984, counsel for the petitioner filed with the court several more motions: motion to combine appeals (7/9/84), motion to stay proceedings (7/9/84), motion to reproduce exhibits (7/16/84), motion for order re transcript and for continuance (7/18/84), motion for fifty-four peremptory challenges (7/20/84), memorandum in support of motion for fifty-four peremptory challenges (7/23/84), motion for continuance re conflict of interest and accompanying memorandum (7/23/84). Furthermore, the petitioner's counsel successfully moved to incorporate all of the pretrial motions made by attorney Jacobs in the prior two trials.

[8] At the habeas hearing, Dakers and Rosenthal attributed their alleged lack of time to prepare to several factors, including the large volume of material that needed to be reviewed from the first two trials, the difficulty in obtaining and organizing that material, and their continuing responsibilities in other cases, as well as the trial court's refusal to grant additional continuances.

produced evidence from two FBI experts that this hair belonged to the petitioner. At his first trial, the petitioner contradicted this evidence through the testimony of Wellon D. Collom, a Pennsylvania criminologist, who stated that there was no similarity between the hair found on the bedsheets and blanket and the petitioner's hair. At the second trial, Collom did not testify in person because of illness, but the trial court permitted his testimony from the first trial to be read to the jury.

At the habeas hearing, Rosenthal testified that he did not contact Collom with regard to testifying in rebuttal at the third trial until "after the state's case was well under way." According to Rosenthal, Collom informed him over the telephone that he was not willing to testify as an expert on hair at the third trial because he had not done hair analysis in many years. Rosenthal did not consider this a serious problem, however, because he believed that Collom's testimony from the first trial could still be read to the jury, as it had been read at the second trial, under the exception to the hearsay rule allowing former testimony into evidence when the witness is "unavailable."[9] See, e.g., Fed. R. Evid. 804; Practice Book §§ 793, 803.[10] The state, how-

---

[9] At the habeas hearing, Rosenthal stated the following: "Mr. Columb [sic], as I indicated, testified live at the first trial, [and] had his testimony read in at the second trial. So it seemed to me that either way we were covered. We had the live witness, if he was available. We had the testimony to read it, as it happened at the second trial, if he wasn't."

[10] "[Practice Book] Sec. 793.——USE OF DEPOSITION

"So far as otherwise admissible under the rules of evidence, a deposition may be used as evidence at the trial or at any hearing if the deponent is unavailable, as defined in Sec. 803. Any deposition may also be used by any party for the purpose of contradicting or impeaching the testimony of the deponent as a witness. If only a part of a deposition is offered in evidence by a party, an adverse party may require him to offer, or he may himself offer, all of it which is relevant to the part offered."

"[Practice Book] Sec. 803.——UNAVAILABILITY

" 'Unavailable' as used in Sec. 793 includes situations in which the deponent:

ever, objected to the introduction into evidence of the former testimony. On September 13, 1984, four days before the conclusion of the petitioner's trial, the trial court, after hearing argument, sustained the state's objection and excluded Collom's former testimony.[11]

The trial court's ruling meant that the petitioner no longer had available to him, either in person or through transcript, the testimony of a hair expert to rebut the incriminating testimony of the state's hair experts. Rosenthal therefore immediately attempted to secure another hair expert, Dr. Peter DeForrest, to testify. On the day following the trial court's ruling, and again on September 18, 1984—the last day of trial—Dakers and Rosenthal moved for a continuance until October 1, 1984, to enable DeForrest, who was temporarily out of the country, to examine, and then testify about, the hair samples that were then in evidence. The state objected, and the trial court denied the motion.[12] Thus,

"(1) Is exempted by a ruling of the judicial authority on the ground of privilege from testifying concerning the subject matter of his deposition;

"(2) Persists in refusing to testify concerning the subject matter of his deposition despite an order of the judicial authority to do so;

"(3) Testifies to a lack of memory of the subject matter of his deposition;

"(4) Is unable to be present or to testify at a trial or hearing because of his death or physical or mental illness or infirmity; or

"(5) Is absent from the trial or hearing and the proponent of his deposition has been unable to procure his attendance by subpoena or by other reasonable means.

"A deponent is not unavailable as a witness if his exemption, refusal, claim of lack of memory, inability, or absence is the result of the procurement or wrongdoing by the proponent of his deposition for the purpose of preventing the witness from attending or testifying."

[11] This court upheld the trial court's ruling on direct appeal, stating that because the petitioner had not secured Collom's physical presence so that he might personally advise the trial court that he was no longer willing to testify as an expert, his unavailability, for purposes of admitting hearsay evidence, was not factually demonstrated. *State* v. *Aillon,* 202 Conn. 385, 390–92, 521 A.2d 555 (1987).

[12] This court on direct appeal affirmed this ruling of the trial court. *State* v. *Aillon,* 202 Conn. 385, 396, 521 A.2d 555 (1987).

the petitioner's counsel was unable to secure a hair expert and the testimony of the state's hair experts went in uncontradicted.

The gist of the petitioner's claim on appeal is that had his counsel properly prepared for trial they would have contacted Collom at a much earlier date and discovered at that time his unavailability, leaving sufficient time to obtain a replacement hair expert to rebut the state's hair experts. The petitioner also points to his counsel's failure to subpoena Collom to trial in order to demonstrate to the court his unwillingness to testify as an expert witness so that his former testimony might be admitted into evidence under the "unavailability" exception to the hearsay rule.[13] These omissions on the part of his counsel, the petitioner argues, fell below the standard of competence required of criminal attorneys and resulted in significant prejudice to his defense. We disagree.

It is unnecessary for us to evaluate whether counsel's conduct was below standard as the petitioner has claimed since we find that he suffered no prejudice as a result of the claimed errors. "[A] court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. . . . If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be followed." *Strickland* v. *Washington*, supra, 697. This court in *State* v. *Aillon*, 202 Conn. 385, 521 A.2d 555 (1987), already considered on direct appeal the effect on the petitioner's case of the lack of testimony to rebut the state's hair experts when it affirmed the trial court's ruling excluding from evidence Collom's former testimony. Id., 393–94. In concluding that the trial court's ruling did not violate the petitioner's

---

[13] See footnote 10, supra.

right to due process of law, we stated: "Even without the hair evidence . . . there was more than sufficient additional evidence adduced at trial to permit the jury to find the defendant guilty as charged. That evidence included the following: (1) the defendant had threatened violence against his estranged wife, one of the murder victims; (2) the defendant was seen in the vicinity of the murder scene on the night of the murders; (3) the defendant lied to police about his activities on the night of the murders; (4) police officers located a serrated-edged knife, the type of weapon used in the murders, in the defendant's automobile on the night of the murders; (5) the blood types of two of the victims matched those of bloody items seized from the defendant's automobile; (6) blood found on one of the severed fingertips of a rubber glove, which had been found near the body of one of the murder victims, was the same blood type as the defendant's, and the glove fragments matched the rubber gloves used at a laboratory at the Yale School of Medicine at which, prior to the murders, the defendant had attended an embalming class; and (7) two witnesses contradicted the defendant's alibi testimony that he had been at his sister's house from the early evening until midnight on the night of the murders." Id., 393. We considered this "compelling evidence of the defendant's guilt," evidence from which "the jury could reasonably have found the defendant guilty . . . *independent* of the [state's] hair testimony . . . . " (Emphasis added.) Id., 393–94.

Even if the absence of rebuttal of the testimony of the state's hair experts was nonetheless arguably a factor in the petitioner's conviction upon his third trial, the petitioner failed to establish, at his habeas hearing, that greater diligence would have produced a different result. In the posttrial hearing, no evidence was introduced to indicate that Collom or any other hair iden-

tification expert would have testified in such a manner as to contradict the hair identification evidence presented by the state. It is therefore a fair inference that it was the unavailability of such evidence, rather than inadequate preparation time, that ultimately led to the failure to produce hair identification testimony favorable to the petitioner. On this record, therefore, there is not "a reasonable probability that . . . the result of the proceeding would have been different." *Strickland* v. *Washington,* supra, 694. Accordingly, we reject the petitioner's claim as it fails to meet the prejudice prong of the *Strickland* test.

The petitioner next claims that Dakers was not properly prepared to cross-examine witnesses at trial. The petitioner's claim is based primarily on Dakers' testimony at the habeas hearing that he felt he was not adequately prepared to cross-examine witnesses because he had not had sufficient time to review the entire transcript of the petitioner's second trial. We are unpersuaded.

Dakers testified that he read the entire transcript of the petitioner's first trial prior to the third trial. The contention that it was also necessary for Dakers to have read the entire transcript of the second trial for him to be adequately prepared to cross-examine prosecution witnesses is highly debatable since much of the second trial transcript is duplicative of the first. Even if we were to conclude, however, that Dakers' failure to read the second trial transcript in preparation for the third trial "fell below an objective standard of reasonableness," the petitioner nevertheless fails to state what favorable effects a reading of the second trial transcript by Dakers would have had on his cross-examination of particular witnesses. Dakers' generalized assertion at the habeas hearing that he believed it was necessary for him to have read the transcript of the second trial in order adequately to cross-examine

witnesses at the third trial falls far short of the showing necessary to demonstrate that, "but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland* v. *Washington,* supra, 694. "[A] court simply cannot fulfill its obligation under *Strickland* to assess prejudice until the petitioner has met his burden of supplying sufficiently precise information." *United States ex rel. Cross* v. *DeRobertis,* 811 F.2d 1008, 1016 (7th Cir. 1987). Without a more specific showing as to how Dakers' failure to read the second trial transcript adversely affected his cross-examination of particular witnesses, and how the allegedly inadequate cross-examination of those witnesses undermined the reliability of the outcome of the trial, the petitioner's claim must be rejected as it fails to demonstrate the required prejudice under *Strickland.*

The petitioner next claims that his counsel's performance was ineffective in that they failed properly to interview or prepare prosecution or defense witnesses prior to trial. Despite the all-encompassing nature of the petitioner's allegation, this claim ultimately focuses on the allegedly inadequate preparation of only two witnesses, i.e., the petitioner himself, and Dr. Luz Aillon, the petitioner's sister.

The following facts are relevant to the petitioner's claim as it pertains to Dr. Aillon. The petitioner was stopped in his automobile by North Haven police officers early in the morning of August 14, 1972, shortly after the occurrence of the murders with which the petitioner was charged. The reason for the officers' detention of the petitioner, however, was not related to the murders. Rather, the officers wanted to determine whether he might be a suspect in a burglary that had just occurred at a power equipment store in the vicinity. While one of the officers examined the petitioner's license and registration, another officer shone a flash-

light inside the petitioner's automobile. The officer observed what appeared to be a knife handle protruding from a bundle of clothing. When asked whether the object was a knife, the petitioner responded that it was. At the request of the police, the petitioner handed over the knife to them. The knife was approximately ten inches in length, with a serrated edge, and stained with what appeared to be blood. The petitioner explained that the stains were juices from meat that he had cut earlier that evening at a picnic at a girlfriend's house on Dixwell Avenue in New Haven. The knife was subsequently returned to the petitioner and, after a consensual search of the trunk of his automobile that revealed no evidence of a burglary, he was released. The entire stop lasted approximately fifteen minutes.

Later that same day, after the bodies of his wife and in-laws had been discovered, the petitioner was taken by the police to the North Haven police station for questioning. He admitted to the officers interviewing him that the statement that he had made previously to the patrol officers early that morning concerning the knife in his car and his whereabouts on the evening of August 13, 1984, was a fabrication. His new explanation for the presence of a knife in his automobile was that he had brought the knife, together with a roast, over to his sister's apartment that night for dinner and that the knife had been used to carve the roast. The petitioner indicated to the officers questioning him that the knife was still in his car. The officers then asked for, and were granted, permission by the petitioner to search his car. Pursuant to this authorization, a search of the car was conducted by the police and a large knife was retrieved from the rear of the petitioner's automobile. Thus, one issue at trial was whether the knife seized from the petitioner's car was in fact the same knife that had been used at Dr. Aillon's home, as he had claimed. At the first trial, Dr. Aillon testified that

the knife in question "appear[ed]" to be the same knife that the petitioner had brought to her home and used to carve the roast.

Prior to the third trial, Dr. Aillon was interviewed by Dakers. Dakers did not show Dr. Aillon the knife nor did he inquire whether she could recall its appearance. Dakers did, however, instruct the witness to testify honestly when she was called upon to testify. Thereafter, during cross-examination of Dr. Aillon by the state's attorney at the third trial, the following colloquy took place with regard to the knife at issue:

"Q. Then after you had taken that five inches of roast, you sliced it with this knife, is that right?

"A. No.

"Q. No? What knife did you slice it with?

"A. With the one my brother brought.

"Q. Oh, this is not the knife your brother brought?

"A. No.

"[State's Attorney]: I just showed her, for the record, Exhibit 299, if the Court please, which is the [knife] removed from the rear of the [petitioner's] car."

Clearly, this testimony of Dr. Aillon was unfavorable to the petitioner's case. The petitioner now claims that if Dakers had properly interviewed Dr. Aillon prior to her testifying he would have discovered her memory lapse concerning the knife in question. Even if we were to agree that proper preparation of the witness required that she be shown the knife to determine her recollection of that item, the petitioner has failed to demonstrate how such preparation would have changed the witness' testimony. The most reliable source of that information would be Dr. Aillon herself, yet the petitioner chose not to have her testify at the habeas hear-

ing. Consequently, in view of the absence of any credible evidence concerning the favorable testimony that would have been elicited from Dr. Aillon had she been more thoroughly interviewed about the knife by Dakers, we conclude that the petitioner has failed to demonstrate prejudice.[14] *Strickland* v. *Washington,* supra, 694.

The petitioner also faults his counsel for allegedly mishandling the preparation for his own trial testimony. Dakers testified that he had met with the petitioner on only a few occasions prior to jury selection, and that his trial preparation of the petitioner consisted of little more than providing the petitioner transcripts of his prior testimony and instructing him to read them. Dakers further testified that he did not believe he had spent enough time consulting with the petitioner prior to trial about his testifying and that this had an "adverse effect" on the petitioner's testimony. The petitioner in his brief claims that this lack of preparation impaired "his ability to appear non-combative, appealing and candid before the jury."

The petitioner, however, offered little or no evidence at the habeas hearing as to what proper preparation of the petitioner in this case would have entailed. Nor does he discuss specifically in his brief how proper preparation, whatever that might be, would have changed his testimony for the better. Absent a more specific showing on these matters; see *United States*

---

[14] Our conclusion regarding the petitioner's failure to demonstrate prejudice is not altered by the fact that, had Dakers shown Dr. Aillon the knife prior to trial and discovered that her testimony would likely be adverse to the petitioner's case, he might have opted not to call her to the witness stand in the hope of preventing her testimony from ever reaching the jury. It is clear that, as the petitioner's only alibi witness, refusing to call Dr. Aillon to testify was not a realistic alternative.

*ex rel. Cross* v. *DeRobertis,* supra, 1016; the petitioner has failed to meet either component of the *Strickland* test.[15]

Finally, the petitioner claims that his counsel were ineffective for having failed to obtain a jury instruction on the lesser included offense of first degree manslaughter. In a conference in chambers with the trial judge shortly before summations were to be given, counsel for the petitioner did in fact request a lesser included offense charge and the judge had agreed that the petitioner was entitled to such a charge. Upon leaving the judge's chambers, Dakers and Rosenthal immediately took the petitioner aside and "explained to him what the situation was." Rosenthal testified that the petitioner "immediately indicated that he did not wish the [lesser included offense] charge to be given." Accordingly, the request to charge on the lesser included offense was withdrawn by counsel. Rosenthal testified that he now believes that the petitioner was under the mistaken impression that a charge on the lesser included offense was an admission of guilt, and that had he and Dakers spent more time explaining to the petitioner precisely what the implications of a lesser included offense instruction would be, the petitioner would have agreed to such a charge and the jury "may very well have rendered a verdict of guilty of the lesser included offense." We are unpersuaded.

Rosenthal's assertion that the petitioner's rejection of the lesser included offense charge was the result of the failure properly to advise the petitioner on that subject is founded upon little more than speculation. It is significant to note that Rosenthal did not testify that the petitioner ever *said* that he thought the lesser included offense charge was an admission of guilt.

---

[15] The petitioner, for reasons not readily apparent from the record, did not testify at the habeas hearing.

Rather, Rosenthal testified that he "sensed" that was how the petitioner felt. The petitioner's claim cannot stand on such a feeble foundation. We agree with the state's assertion that "[b]ecause the petitioner [has] failed to offer testimony concerning the basis for his rejection [of the lesser included offense charge], he cannot now speculate that his actions were based upon insufficient knowledge." Our review of the record before us leads us to conclude that the conduct of the petitioner's counsel with respect to the withdrawal of the lesser included offense charge was proper and did not fall below an objective standard of reasonableness. *Strickland* v. *Washington,* supra, 688.

There is no error.

In this opinion the other justices concurred.