[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
The petitioner brings this Second Amended Petition for a writ of habeas corpus alleging that his criminal trial attorney, Leo Ahern, was ineffective in assisting him in that he failed to adequately (1) consult and advise the petitioner as to the evidence, defenses, plea negotiations, the consequences of plea, whether to testify and as to the suppression of his statement; (2) investigate facts, witnesses and police reports; (3) prepare for the hearing in probable cause, suppression of his statement and identification, for cross-examination of witnesses and presentation of evidence; (4) prepare for trial to present and exclude evidence, cross-examine and set out a theory of defense for effective argument on the motion for judgment of acquittal and closing argument; (5) preserve petitioner's right to sentence review.
The jury reasonably could have found the following facts. On November 7, 1989, at approximately 5:50 p. m., Bridget Page left her home on Orchard Street in New Haven and drove to the home of Javin Green, a friend whom she had been dating, in order to celebrate her birthday. Green lived on Dixwell Avenue in New Haven. Along the way at the corner of Dixwell Avenue and Argyle Street, Page heard a noise that sounded like a "tap"; then her car's rear window began to break up and fall out as she drove along. When Page arrived at Green's home she told him about the broken window and said that she thought some children had thrown rocks at the window. Green and Page decided to return to the intersection in order to determine who was responsible for the broken window.
They drove back to the intersection of Dixwell Avenue and Argyle Street, parked the car on Argyle Street near the corner and walked over to five individuals who had congregated at the corner. The group consisted of three children, each approximately eight years old, and two young men, each approximately eighteen years old. Located on the corner of Dixwell Avenue and Argyle Street was a Laundromat, an entrance to an apartment building and a beauty salon, all fronting on Dixwell Avenue. A street light and the lights from the Laundromat were on. Green first spoke to the children, stating that one of them was responsible for the broken window. CT Page 15483
At this point, Brenda Clark, who resided at 425 Dixwell Avenue in an apartment directly over the Laundromat opened the apartment building entrance door. Her attention was drawn to Green and one of the young men, whom she later identified in court as the defendant. Green and the defendant were standing close to each other, face to face, in front of the Laundromat. Green was facing the street with his back to the Laundromat. The defendant was facing Green with his back to the street. Page stood within inches of Green, facing him, on his left. Green was upset and was thrusting his chest towards the defendant's chest, saying "I want that little dude that, you know, shot the rock." The defendant began walking towards Green's right side in an effort to get behind Green. Green told him to stop and the defendant replied "Oh, yes." The defendant next moved back three or four steps towards the street, reached into his pants, pulled out a revolver and fired three or four shots at Green.
After the shots were fired, Green grabbed his face and stomach, cried out "oh, oh" and left the scene by running around the corner onto Argyle Street. Following the departure of Green and Page, the defendant turned his gun towards a "little boy" who ran into the door where Clark was standing. The defendant looked over at Clark, turned around, walked away and entered a nearby car. Page, who initially had not been aware that Green had been shot, followed him around the corner and saw him enter her car on the passenger side. Green told her that he had been shot and she drove him to the hospital, where he died. State v. Stanley,223 Conn. 674, 676-7.
The petitioner called himself, his younger brother Edward, his friend, Steven Herrington, the criminal trial attorney, Leo Ahern and Attorney Vicki Hutchinson for her expert testimony.
The petitioner testified that he met Ahern at his probable cause hearing and that he wasn't in court for that hearing but in a little room where he could listen. The transcript indicates his attorney made such an arrangement so that Bridgett Page, the girlfriend of the victim, who had been unable to identify him from several attempts at photographic showings would not see him. He was brought into the courtroom after she had testified and left. He complained that his attorney conveyed an offer of plea for forty-five (45) years which he refused but didn't produce an alibi defense or offer a third-party culpability defense. He decided, because of his criminal record, that he would not CT Page 15484 testify in his own defense and at the time of the hearing on the suppression of his statement, he decided not to testify, although he felt that he was coerced by Det. Burton to give the statement to save his mother and little brother harassment.
Both Edward Stanley and Steven Harrington testified that they were available to testify at the criminal trial that, although the argument took place out in front of the Laundromat, the shooting took place in the hall of the petitioner's mother's house while they were inside with each other and the petitioner's father, mother and father's friend.
Harrington testified that he knew the petitioner had been arrested for murder but didn't come forward to the police because he was a drug dealer who had a drug charge and a failure to appear in court charge which he was avoiding.
Detective Burton testified for the respondent that he had taken two statements from Edward, one on November 8, 1989, the day following the shooting and one, more complete, on November 9, 1989 in which Edward stated that the petitioner was arguing with the black man in front of the Laundromat on November 7, 1989 when he, Edward, ran home to tell his mother and that he did not hear the shooting or know where the petitioner later had gone.
Because the statement given by the petitioner on December 3, 1989, Petitioner's Exhibit A, in which he admitted arguing with the black male who complained about Edward breaking his car window while both were in front of the Laundromat is consistent with the sequence of events on November 7, 1989 as testified by Edward's statement to Det. Burton on November 9, 1989, this court can give no credit to the testimony of Edward and Harrington in this hearing that Green ever entered the building housing the Stanley home.
Ahern testified that he had discussed the case with the petitioner and told him that his statement was tantamount to a confession because it put him at the scene in confrontation with the victim as stated by the eyewitnesses. He discussed the plea offer of forty-five (45) years and told him that it would include the resolution of his other charges as well. He calculated that with such a sentence, he could get out in twenty-five (25) to twenty-eight (28) years. He believed that offer was still available right up to trial but the petitioner refused it. He had a hearing on the motion to suppress the statement, the CT Page 15485 identification by Brenda Clark but not the motion in limine because the petitioner was not going to testify and he didn't pursue the motion to suppress evidence because he felt it added confusion rather than identification. The most the ballistics expert could determine was that the two bullets taken from the victim were fired from the same gun, and the two shell casings found at the scene were not ejected from that gun. Likewise the third bullet found at the scene could not be determined to have been fired from the gun which fired the other two bullets. No gun was produced.
The petitioner in his argument claims that Ahern (1) should have used the hearing in probable cause for discovery; (2) should have been able to suppress the petitioner's statement; (3) should have been able to suppress the identification by Brenda Clark; (4) cross-examine Bridgett Page more thoroughly; attack Clark more adequately; and (5) obtained a Sentence Review.
 I.
Petitioner claims Ahern didn't use the Hearing in Probable Cause for discovery in questioning the witnesses. Only two witnesses testified, Page and Det. Burton. Ahern knew Page could not identify the petitioner so there was no need to solidify her thoughts on the shooter and he kept the petitioner from her sight. Det. Burton only introduced the petitioner's statement. General Statutes Section 54-46a prohibits motions for discovery or suppression at the hearing and the rules of evidence applies so cross-examination would be limited to that area covered by direct.
 II.
Petitioner claims at the habeas hearing that he gave his statement to the police so they wouldn't harass his mother or brother: The reason given in his statement is because he didn't do it, that is shoot Green. Respondent's Exhibit A. There is nothing in the statement to show any coercion. His answers were responsive and complete and demonstrated no faltering or indecision. Petitioner claims that Burton's testimony was that he suggested that it would be best for the petitioner to give a statement so that his mother and brother would not become involved when in fact his answer was it was possible it was discussed. But he clarified any question of this by testifying that no promises were made that his mother and brother would not CT Page 15486 be involved in the case.
The statement was taken over a period of time of less than one hour and the petitioner was able to read and initial each page as it was finished by the secretary. He had been given his Miranda warnings before the start of the questioning and he would see the tape recorder on the desk. The court finds that the statement was given knowingly, intelligently and voluntarily.State v. Lapointe, 237 Conn. 694, 734; State v. Correa,241 Conn. 322, 338. The court believes Burton that he was not aware that the petitioner had refused to waive his Miranda rights to Petola a short time before Burton came on duty but even if he did know, Burton could recommence interrogation when the petitioner waived his right subsequently to remain silent. Michigan v. Mosley,423 U.S. 96. Petola didn't question the petitioner after he had advised him of his rights and asked him to sign the waiver of rights form to which the petitioner responded "I'm not signing anything", Petitioner was in the corrections facility when Burton came on duty at 8 a.m. It was necessary for Burton to ask a correction officer if the petitioner would see him. When the petitioner obliged, it was his choice and not after being held by the police in an interrogation type setting. State v. Shifflett,199 Conn. 718, 744.
 III.
The petitioner claims that the identification by Clark was suggestive and unreliable and that Ahern should have been able to suppress it. The fourteen photographs presented to Clark have been marked as Petitioner's Exhibits 8 and 9 A-M. They are all of young black males with similar short hair styles and no facial hair but three (3) which appear to have slight moustache hair. They are all about the same facial structure in black and white photography. Clark, in making her selection of the petitioner from the pile of photographs, was not aided by the two officers who were seated in her pastor's dining room apart from Clark. This court must find that the section process was not suggestive.State v. Ledbetter, 185 Conn. 607, 612.
Even if the procedure was in some way suggestive, it was nonetheless reliable based on an examination of the totality of the circumstances. Id., 611. She was able to identify the petitioner in court with certainty as she did his photograph. She observed him in a confrontation with Green about twelve (12) feet from where she was standing with an unobstructed view of his face CT Page 15487 for a period of time of five (5) to ten (10) minutes in a confrontation ending in a once in a life time result of her life. Her concentration was so riveted, it shut out everything else. It was likewise corroborated by Green's companion by words and action of the two participants, a person which she neither saw nor knew. Her statement and identification of the photograph were made the following day to the police.
 IV.
A review of Ahern's cross-examination of Clark and Page showed expertise in bringing before the jury two different types of defense. As to Clark who did identify the petitioner, he made an attempt to question her failure to bring an immediate description to the police and questioned her ability to see adequately from her vantage point. As to Page who was unable to identify a photograph of the petitioner, he attempted to confuse her as to which of the teenagers was the shooter.
 V.
A successful petitioner must show that there is reasonable probability that but for counsel's unprofessional errors, the result of the proceedings would have been different. Copas v.Commissioner, 234 Conn. 139 (1995); Strickland v. Washington,466 U.S. 668, 694. As pointed out above the petitioner has failed to prove counsel's representation fell below an objective standard of reasonableness. Aillon v. Meachum, 211 Conn. 352, 359. But even if the shot-gun approach used by the petitioner to remove from the case his statement, the identification by Clark and a less than adequate cross-examination of Clark and Page, the petitioner is unable to show that a different result would occur. William Louis Byers corroborated that it was the petitioner on the scene who was arguing with Green and that it was the petitioner who left in his car after shots had been fired. This sufficiently corroborated the sequence of events that Clark and Green and during such confrontation stepped back, pulled a gun and shot three (3) to four (4) shots from which Green was mortally wounded. Clark also testified that the shooter then went to a dark car and got in on the passenger side and the car drove away.
 VI.
Ahern did testify that although the application for Sentence CT Page 15488 Review was filed and that he requested a stay of such hearing until after the appeal, he does not remember receiving a notice of dismissal of such application. For that reason the petitioner should have his right to Sentence Review restored.
For the above reasons, the Court grants restoration of his right to Sentence Review but denies the rest of his petition.
Thomas H. Corrigan Judge Trial Referee