[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
The petitioner was the defendant in the criminal case of State ofConnecticut v. Patrick Nemhard, CR93-083123, in the Judicial District of Fairfield at Bridgeport. He was tried before a jury during April and May of 1994, Judge G. Sarsfield Ford presiding, and was found guilty of the charge of rioting at a correctional institution in violation of Connecticut General Statutes § 53a-179b.[1] was thereafter sentenced on June 16, 1994 to a sentence of twenty years, execution suspended after fifteen years, and five years probation, to be served consecutive to a previously imposed sentence for felony murder in another file. The petitioner was represented at trial by Attorney Dante R. Gallucci as a special public defender. Attorney Gallucci also represented the petitioner on his direct appeal from his conviction which was denied in a per curiam opinion by the Appellate Court. State v. PatrickNemhard, 39 Conn. App. 930 (1995).
The petitioner thereafter filed this petition for writ of habeas corpus. His pro se petition was dated May 13, 1998. Attorney Vicki CT Page 7898 Hutchinson was then appointed to represent the petitioner. A revised amended petition was filed, dated February 2, 2000, alleging that the petitioner's incarceration is illegal because his conviction of the charge of rioting in a correctional institution was obtained in violation of his right to the effective assistance of trial counsel. A return was filed, dated February 15, 2000, denying the allegations. The habeas trial was held on April 10, 2000.
At the habeas trial, the following exhibits were introduced by the petitioner:
 Exhibit 1: Trial Transcript Volume 1: State v. Patrick Nemhard, CR93-083123 April 29, 1994; May 2, 1994.
 Exhibit 2: Trial Transcript Volume 2: State v. Patrick Nemhard, CR 93-083123
 May 3, 1994; May 4, 1994; May 5, 1994; May 6, 1994; May 9, 1994, Exhibit 3: Layout of 39 Block at Bridgeport Correctional (Exhibit 1 at criminal trial of State v. Patrick Nemhard, CR 93-083123).
 Exhibits 4-7: Photocopies of photographs entered as Exhibits 17, 18, 19 and 20 at criminal trial of State v. Patrick Nemhard, CR 93-083123.
The habeas corpus court had the opportunity to view the original exhibits 1, 17, 18, 19, and 20 from the petitioner's criminal trial, which were subpoenaed to court under the custody of the clerk of court from the Judicial District of Bridgeport. By stipulation of the parties, the court admitted the photocopies of the original trial exhibits as exhibits at the habeas trial.
The respondent/warden introduced as exhibits:
 Exhibit A: The Record before the Appellate Court on the direct appeal in State v. Patrick Nemhard, A.C. 14030.
 Exhibit B: The Brief of Appellant, submitted by Attorney Dante Gallucci, A.C. 14030.
 Exhibit C: The Brief of Appellee, submitted by Assistant State's Attorney Richard Jacobson, A.C. 14030.
 Exhibit D: A typewritten letter to Patrick Nemhard from Attorney Dante Gallucci, dated December 8, 1993, with handwritten comments added to the letter by Patrick Nemhard. CT Page 7899
At the habeas trial, the witnesses consisted of the petitioner, Attorney Dante Gallucci, and Sergeant John McGuire of the Connecticut State Police.
An examination of the trial transcripts and appellate briefs show that the petitioner's prosecution stems from a riot and assault at the Bridgeport Correctional Center on January 16, 1993, during which an employee of the Department of Correction was severely injured and during which damage was done to fixtures and equipment, including a metal screen and a window, in the day room in block 39. The petitioner was one of several inmates prosecuted as a result.
The petitioner was charged in a multi-count information with assault in the first degree, assault on a department of correction employee, attempted escape in the first degree, rioting at a correctional institution, conspiracy to commit assualt first degree, and escape first degree. Record at 6-7.
The state's case at trial is summarized in the appellee's brief at pages 2-7, as follows:
 On January 16, 1993, Correction Officer Anthony Wilson noticed at about 12:15 to 12:30 a.m. that butter had been smeared on the plexiglass of the cubicle in the 39 Block which was used by the officers to open and close the doors. He spoke with his fellow officer, Gary Duboise to get his clean up crew to clear the butter off. According to Wilson, unless the corridor door was closed, the cell doors would not open. Other doors prohibit inmates from getting from one cellblock to another. The doors are operated from the officer's panel in the cubicle. Later on, he noticed that inmates were running the cubicle (the officer's "bubble") and he alerted the officer's cafeteria so that additional help could be provided to check out the situation. At about 1:30 or 1:45 a.m., doors were opening and closing in a haphazard manner. He observed inmates running down the corridor. T. 1 at 15-54. Exhibit 1 (a diagram of the 39 Block) was introduced as a full exhibit.
Officer Milando McGee was in the cafeteria when he received a call that something was happening in the 39 Block and that inmates were out of their cells. He responded and saw inmates running around and observed that there was no officer in the cubicle. McGee sent for an override key CT Page 7900 to gain entrance to the cubicle. In Cell 11 of the A-8 corridor he found Officer Duboise, who was the officer who had been in charge of the block. Officer Duboise had been severely beaten. McGee explained that to gain access to the block's day room the cell doors have to be closed and then the day room door is opened. There is a door leading to an outside area off the day room. While looking for the inmate who had been operating the cubicle, McGee saw Nemhard in his cell in the A-10 Corridor. The defendant was bleeding and told him that he got his finger shut in the door when somebody was opening and closing the cell door. The witness at one point had seen Nemhard, whom he knew, running towards the A-10 Corridor. Nemhard was one of the inmates who had run towards him and then turned. McGee also noticed that the red door in the day room was damaged, as if someone had been tampering with it. He saw a couple of fire extinguishers which were normally kept in the cubicle and some blood on the door leading to the recreation yard as well as a speck of blood on the floor. It seemed that someone was trying to peel the wire screen off the window. The door was closed, but the wire mesh was damaged. T. 1 at 55-114.
Detective John McGuire of the Connecticut State Police was called to investigate the occurrence. He saw and photographed a piece of a human finger along the eastern wall of the A-10 day room. He also noticed blood on the door jamb to the defendant's cell but no corresponding stain on the door. McGuire also noticed blood-like stains to the left of the door in the day room at about the same level as the damage to the door. He was able to locate the fingertip about 10 feet from the door. T. 1 at 115-131.
Officer William Jackson also found a fire extinguisher in the A-10 room and noticed that the screen on the door that leads to the courtyard was ripped about halfway up. He observed a tip of a finger just below the screen, less than a foot away from the door. Jackson presumed that the noise which drew his attention to the area was the fire extinguisher crashing against the plexiglass of the window. T. 1 at 133- 145. Screen on the door leading to the courtyard that had been torn.
Officer Frank McNeil noticed the metal screen which had been tampered with and torn away halfway up. He saw 2 fire extinguishers, which were normally stored in the officer's cubicle, in a little bathroom area. The door was blocked by a stack of 5 or 6 plastic chairs. T. 1 at 166-176.
Lieutenant Phillip Petaco, supervisor of the 12 to 8 shift, was called to the area of the disturbance. He found an ABC and a water fire extinguisher in the day room. They were damaged on the bottom, as if used to hit the door or the screen. He concluded that the fire extinguishers were used to attempt to knock out the plexiglass panel on the window, CT Page 7901 since the red and white marks on the door matched the paint on the ABC extinguisher. The door screen had been torn off its rivets halfway up the window. Petaco also observed a stack of plastic chairs. Using his flashlight, he found a fingertip on the day room floor about 3 feet from the damaged door. In a little over 10 years with the Department of Correction, he had never heard of an inmate receiving lacerations from a cell door. He stated that staff and inmates had gotten hands and fingers caught in the doors but that the door is usually closed, released or stopped when a limb is stuck in them. Petaco saw blood on the floor of Nemhard's cell but none on the cell door. T. 1 at 177-204.
The injured officer, Gary Duboise, had authorized 3 men to clean up when he went on a tour of the cell block. Someone called him over. While he was speaking to an inmate, he was hit on the back of the head. He was placed in a cell and lost consciousness. Among other injuries, he sustained fractures of the jaw and skull. He believed that he was hit with a mop wringer. Duboise was not sure that Nemhard participated in his beating that morning. T. 1 at 205-229.
The facility's engineer, John Pimpinelli, testified that part of his job was to maintain and repair approximately 250 cell doors in the institution. The doors open and close electronically and are operated by the officer in the cubicle. The door sits in a jamb which is 1/4 inch deep. All the edges of the door and the jamb are rounded off. There are no sharp edges. A person can stop the door by using his fingers. During his 20 years on the job he had never heard of anyone cutting a finger in the door. He also identified a photo of the day room door depicting the ripped and bent sheet metal. T. 2 at 4-35.
Inmate Richard Gomez, housed in Cell 1 on the A-8 Corridor of the 39 Block, was looking out his cell using a mirror. He was able to see the guard being beaten. Prior to the attack, he saw at least 10 inmates out of their cells. He saw Nemhard out of his cell and observed him speaking with the inmate nicknamed "Fat Rat," who was operating the cubicle. He heard inmates speaking of puffing the guard in a cell. Gomez's written statement was read to the jury. Included in it was the passage, "I also saw Patrick Nemhard in the hallway, but I did not see him hit the CO." Gomez could positively identify Nemhard as standing in the corridor. T. 2 at 37-71.
At the conclusion of the state's case, Assistant State's Attorney John Smriga nolled the counts pertaining to the assaults. The petitioner's motion for an acquittal on the remaining three counts was denied. T. 2 at 76-81.
A defense was presented. Petitioner stated his fingertip was severed CT Page 7902 when his hand caught as the door to his cell closed. The petitioner also testified that there were blood stains around the door and door jamb, but the stains were not photographed or preserved. During the course of the criminal trial, photographs of a cell door (not the petitioner's cell door) were admitted as exhibits and shown by the state to the jury to disprove the petitioner's statement that his finger was severed when crushed in the closing cell door. The petitioner testified at the habeas trial that his criminal trial counsel, Attorney Dante Gallucci, failed to suppress this evidence. The petitioner claims the evidence should have been suppressed because potentially exculpatory evidence (i.e. photographs and testing of the blood stains on the petitioner's cell door) had not been photographed, preserved or investigated in any way by the state or by the petitioner's own criminal trial counsel. Additionally, the petitioner stated, during the habeas hearing, that the door to his cell had a sharp edge which was capable of severing a fingertip, but that the edge of the door shown in the photograph admitted in the criminal trial was rounded off.
The primary issue on direct appeal was the sufficiency of the evidence to prove the charge of rioting in a correctional institution. The state argued that the evidence and the inferences drawn therefrom supported the conclusion that the petitioner participated in the riot. Firstly, the petitioner was out of his cell and was seen speaking with "Fat Rat," the inmate operating the cubicle. Secondly, the diagram of the 39 Cell Block (Exhibit 1 at trial, also an exhibit at the habeas trial) shows the location of the petitioner's cell and the location of the A-10 day room where the damage to the metal screen and door occurred and where the petitioner's fingertip was found. Assuming that the petitioner's cell is Cell 11 in A-10 Corridor of Block 39 (which is consistent with the testimony of the petitioner at the habeas trial), the presence of the fingertip in the day room supported the inference that the petitioner severed his fingertip on the torn metal mesh. In order for the fingertip to have been severed in the cell door and be found near the day room door, it would have had to have traveled some distance and turned several corners.
At the habeas trial, petitioner testified that he was serving two sentences: the first sentence for felony murder; and the second consecutive sentence imposed here for rioting. He also admitted on cross-examination to other felony convictions. He admitted that he had injured his middle index finger on his left hand on the date of the crime and that the trial testimony was that his fingertip was found in day room. He reiterated his claim that the injury occurred when his cell door closed on his finger. He claimed that the corrections officers moved evidence in the process of restoring order in the facility and that the case wasn't investigated properly. In particular, he claimed that CT Page 7903 Detective McGuire should have taken photographs of his cell door to corroborate his defense. He also claimed that counsel did not explain the elements of the crime of rioting and did not discuss the evidence.
Attorney Gallucci testified that he had been appointed after the petitioner's case reached the Part A court and that he was notified sometime in March of 1993. The Record on direct appeal shows his appearance as of April 8, 1993. Attorney Gallucci testified that he was a special public defender assigned to the case and that he had extensive experience handling serious felony matters. In particular, he was familiar with the charge of rioting in a correctional institution because he had previously defended that charge at a similar trial and on appeal. Attorney Gallucci testified that he had discussed the evidence the state would be producing at trial with his client and that he had explained the elements of the crimes charged to Mr. Nemhard. He advised his client that, based on the version of events that he had heard from Mr. Nemhard, he expected that his client would be convicted of several of the charges, including the rioting charge. He advised his client to seriously consider the plea bargain that had been offered by the state. He testified that his client had told him prior to trial that, indeed, he had cut his fingertip on the metal mesh covering the day room door.[2]
Attorney Gallucci did not take a photograph of the petitioner's cell door. However, the petitioner agreed that the door and his cell had been cleaned prior to Attorney Gallucci's involvement. Attorney Gallucci produced a letter that he had written to his client documenting his advice. The letter contained handwritten comments by Mr. Nemhard when he mailed the letter back to Attorney Gallucci. The letter clearly establishes that Mr. Nemhard was informed of the rioting charge and was urged to seriously consider an offer from the state of five years (consecutive). The Court finds the testimony of Attorney Gallucci to be most credible. The Court further finds, on the basis of all evidence presented, the petitioner's testimony to be not credible.
Sergeant McGuire testified that he was the Connecticut State Police officer assigned to investigate the case. He reiterated his trial testimony that he examined the defendant's cell door but did not take photographs. He stated, consistent with his trial testimony, that his observation of the door revealed that there was blood on the doorjamb but not on the corresponding part of the door itself. This led him to conclude that the defendant had not cut his finger in the door.
An accused's right to the effective assistance of counsel is derived from the mandate of the sixth amendment to the United States Constitution,[3] as made applicable to the states through thefourteenth amendment to the United States Constitution.[4] This right also appears in article first, section 8, of the Connecticut CT Page 7904 Constitution.[5] Siano v. Warden, 31 Conn. App. 94, 96, cert. denied,226 Conn. 910 (1993). The right to counsel, however, is the right to effective assistance and not to perfect or error free representation.Commissioner of Correction v. Rodriquez, 222 Conn. 469, 478 (1992);Williams v. Bronson, 21 Conn. App. 260, 263 (1990).
"A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction . . . has two components. First, the defendant must show that counsel's performance was deficient . . . Second, the defendant must show that the deficient performance prejudiced the defense . . . Unless a defendant makes both showings, it cannot be said that the conviction . . . resulted from a breakdown in the adversary process that renders the result unreliable."Strickland v. Washington, 466 U.S. 668, 687 (1984); Lozada v. Warden,223 Conn. 834, 842 (1992); Williams v. Warden, 217 Conn. 419, 422
(1991); Aillon v. Meachum, 211 Conn. 352, 357 (1989).
Therefore, to prevail on a claim of ineffective assistance of counsel, the convicted defendant must demonstrate both deficient performance and actual prejudice. Bunkley v. Commissioner of Correction, supra,222 Conn. 455. To satisfy the first prong of the test, that counsel's performance was deficient, the defendant must show that his counsel made "`errors so serious that [he] was not functioning as the "counsel" guaranteed by the Sixth Amendment.'" Id., quoting Strickland v.Washington, supra, 466 U.S. 694. Counsel's representation must be shown to have fallen below an objective standard of reasonableness considering all of the circumstances. Id. at 687-88; Daniels v. Warden,28 Conn. App. 64, 69, cert. denied, 223 Conn. 924 (1992). "Judicial scrutiny of counsel's performance must be highly deferential, and a reviewing court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Chacev. Bronson, 19 Conn. App. 674, 678, cert. denied, 213 Conn. 801 (1989). The petitioner must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy. Strickland v. Washington, supra, 466 U.S. 689; Daniels v.Warden, supra, 28 Conn. App. 69-70, "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct from circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Strickland v. Washington, supra, 466 U.S. 689.
In order to satisfy the second prong of the test, that counsel's deficient performance prejudiced his defense, the defendant must prove that "counsel's errors were so serious as to deprive defendant of a fair trial, a trial whose result is reliable." Bunkley v Commissioner ofCorrection, supra, 222 Conn. 455; Strickland v. Washington, supra, CT Page 7905466 U.S. 687.
This second prong of the test is satisfied if the defendant can demonstrate that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. Strickland v. Washington, supra, 466 U.S. 694; Siano v.Warden, supra, 31 Conn. App. 98.
"[A] court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies.. . . If it is easier to dispose of an ineffective [assistance] claim on the ground of lack of prejudice. . . that course should be followed." Aillon v. Meachum, supra, 211 Conn. 362;Fair v. Warden, 211 Conn. 398, 430, 559 A.2d 1094 (1989). As a result, "[f]ailure to make the required showing of either deficient performance or sufficient prejudice defeats the ineffectiveness claim." Stricklandv. Washington, supra, 466 U.S. 700.
Constitutionally adequate assistance of counsel includes competent pretrial investigation. Siemon v. Stoughton, 184 Conn. 547, 555 (1981);Ostolaza v. Warden, 26 Conn. App. 758, 764, cert. denied, 222 Conn. 906
(1992). In a habeas corpus proceeding, the petitioner's burden of proving that a fundamental unfairness has been done is not met by speculation but by demonstrable realities. Ostolaza v. Warden, supra, 765. The reasonableness of an attorney's investigation decisions often depends critically on the information supplied by his client. Williams v.Warden, 217 Conn. 419, 426 (1991). "The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions. Counsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant. In particular, what investigation decisions are reasonable depends critically on such information. For example, when the facts that support a certain potential line of defense are generally known to counsel because of what the defendant has said, the need for further investigation may be considerably diminished or eliminated altogether. When a defendant has given counsel reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable. In short, inquiry into counsel's conversations with the defendant may be critical to a proper assessment of counsel's investigation decisions, just as it may be critical to a proper assessment of counsel's other litigation decisions." Stricklandv. Washington, supra, 466 U.S. 691. The reasonableness of an investigation must be evaluated not through hindsight but from the perspective of the attorney when he was conducting it. State v. Talton,197 Conn. 280, 297-98, 497 A.2d 35 (1985). CT Page 7906
A complete review of the testimony and evidence presented allows the Court to find that the petitioner has received effective assistance of counsel. Specifically, the Court does find that the petitioner elected to go to trial despite the advice of his attorney, not because of it. His advice was sufficient and based on his assessments of the case law, the strength of the state's case and on the petitioner's own account of the events, including his admissions of guilt.
Under the factual circumstances of the case, Attorney Gallucci effectively represented his client while complying with his responsibilities to the Court. Attorney Gallucci used a reasonable trial strategy in defending the petitioner. A criminal defense attorney can often benefit from what was not done in the investigation of a case. In the present case, Attorney Gallucci had every reason conclude that his client had cut his finger on a metal screen over the day room door because his client had told him as much. It therefore was a sound trial strategy not to obtain or request testing of the screen, since counsel had reason to conclude that such testing would only corroborate the prosecution's case. Similarly, a photo of the cell door, if introduced by the defense, had the possibility of establishing of implausibility of the defendant's story. Since the prosecution did not have the photographs either, and the prosecution had the burden of proof, defense counsel could exploit this fact and at the least argue that the prosecution was presenting an incomplete case. The petitioner has not shown that this tactic was not a sound trial strategy.
Further, the petitioner's case was not prejudiced by the decisions of Attorney Gallucci made in his trial defense. His decisions appear, even in hindsight, to be appropriate and reasonable, especially in light of the petitioner's acknowledgment of guilt.
Accordingly, the petition for writ of habeas corpus is hereby denied and dismissed.
Robert Resha, Judge