RICHARD MAGNOTTI *v.* LARRY R. MEACHUM,
COMMISSIONER OF CORRECTION
(8357)

NORCOTT, FOTI and LANDAU, Js.

Argued June 11—decision released August 21, 1990

*Mark Rademacher,* for the appellant (petitioner).

*Julia DiCocco Dewey,* assistant state's attorney, for
the appellee (respondent).

NORCOTT, J. The petitioner appeals from the trial court's denial of his writ of habeas corpus. He challenges the trial court's rejection of his claim of ineffective assistance of counsel in violation of his rights guaranteed by the sixth and fourteenth amendments to the United States constitution and article first, § 8, of the Connecticut constitution.

After a trial to a jury, the petitioner, Richard Magnotti, was indicted for murder in violation of General Statutes § 53a-54a and was convicted of the lesser included offense of manslaughter in the first degree in violation of General Statutes § 53a-55 (a) (1). That conviction was upheld in *State* v. *Magnotti,* 198 Conn. 209, 502 A.2d 404 (1985).

Thereafter, the petitioner filed a petition for a writ of habeas corpus based upon a claim of ineffective assistance of appellate counsel. The basis of his claim is that his appellate counsel failed to raise certain issues on appeal that he alleges were stronger and more likely to be successful than those actually raised. After an evidentiary hearing, the habeas court, *Meadow, J.,* denied the petition. From this ruling, the petitioner appeals.

At the trial for the underlying offense, the jury could have reasonably found the following facts. On January 26, 1981, at approximately 1:55 a.m., Marion Millbank, a resident of 865 Mix Avenue, apartment 317, in Hamden, was awakened by the sounds of a struggle coming from apartment 417 directly above her. That apartment was occupied by the petitioner and his mother, Louise Russell, and by the victim, William Russell. Millbank got out of bed and went to the kitchen, where she heard two male voices angrily exchanging obscenities. She also heard heavy footsteps and the sound of bodies bumping into the kitchen cabinets.

Millbank woke her sister, Rita Bree, and the two went back into the kitchen where they heard the sounds of a violent struggle. The sisters called their upstairs neighbor to attempt to stop the commotion, but no one answered the phone. The sisters then heard a male voice say, "You'll break your mother's hand." The sisters then called the police at approximately 2 a.m.

Officer Gary Komoroski of the Hamden police department went to 865 Mix Avenue, arriving at approximately 2:04 a.m. Officer George Kitsos and Sergeant Donald Grey arrived at about the same time. They went to apartment 417 and were let in by Louise Russell. The officers observed the body of William Russell, the petitioner's stepfather, lying face down on the floor against the door. Komoroski checked the victim's body for vital signs and found that he was dead. The victim had been stabbed. Blood was splattered throughout the apartment. The police also found a bloodstained pink robe in the master bedroom, a bloodstained sponge and towel in the kitchen and a bloodstained towel by the victim's body. Louise Russell was then taken to a bedroom and was advised of her *Miranda* rights.

Komoroski stationed himself at the fourth floor elevator. At approxmately 2:20 a.m., Mark Magnotti, the petitioner's nephew, stepped out of the elevator and was asked by Komoroski to identify himself and explain his presence. Magnotti informed the officer that he had received a call from his grandmother, Louise Russell, telling him that the victim and the petitioner had had a fight. She was upset when she called, and she had asked Magnotti to pick up the petitioner on Mix Avenue.

Dryden Ballentine, the occupant of apartment 517, was awakened at about 2 a.m. by a noise from somewhere in the building. He went to a window and saw several police cars arrive at the apartment complex.

Approximately eight minutes after the police had arrived, he observed a man wearing a leather jacket, similar to that worn by the petitioner upon his arrest, leaving the building through its fire exit and proceeding to a walkway by the building's side entrance. He then left the walkway and continued alongside the building.

At approximately 2:45 a.m., the petitioner stepped out of the fourth floor elevator. Komoroski asked if he was Richard Magnotti, and the petitioner responded affirmatively and asked what had happened. The petitioner's hands and clothing were stained with blood; Komoroski frisked him for weapons and then radioed the other officers in the apartment to inform them that he had the petitioner in custody.

The officers then escorted the petitioner into the master bedroom where his mother was. The petitioner approached his mother and asked her what had happened and attempted to hug her, but she pulled away, indicating to the petitioner that he had experienced an epileptic seizure.

The petitioner asked Inspector Thomas Rhone, who, in the interim, had arrived with Inspector John Cronin, what had happened. Cronin observed blood on the petitioner's hands and clothes and also observed that he appeared to have been drinking. The petitioner was then advised of his *Miranda* rights and placed under arrest for the murder of the victim.

The officers questioned the petitioner concerning the events of that night, and he said that the last thing he remembered was that after dinner, at approximately 6:30 p.m., he was watching a football game. He next remembered walking through Hamden Plaza to his apartment and noticing police cars in the area. He then told the police that if he had done anything wrong, he would have left the area and not returned. The peti-

tioner said that he would cooperate and that, while he did not remember having a seizure, he felt tired, as if he had had one. He was then transported to the Hamden police station where police secured fingernail scrapings from his hands.

The cause of the victim's death was determined to be a stab wound through the heart, a wound typical of that caused by a smooth bladed knife. There were three other stab wounds on the victim's body and several bruises on his chest and shins, and there was a considerable amount of blood on his clothing. The blood samples taken from the petitioner's clothing were tested and found to be the same blood type as the victim's.

The jury returned a verdict of guilty of manslaughter in the first degree. The petitioner appealed, and his conviction was affirmed.[1] See State v. Magnotti, supra. He then petitioned for a writ of habeas corpus, and that petition was denied.

The petitioner claims that he did not receive effective assistance of appellate counsel because his counsel did not raise the following issues: (1) the trial court improperly excluded hospital records supporting the fact that he had a history of epileptic seizures; (2) the trial court improperly denied his motion for a mistrial, and his subsequent motion for a new trial, after the midtrial suppression of a knife that had been shown to three witnesses; and (3) the trial court improperly denied the petitioner's written request to charge on diminished capacity or the effect of epilepsy on the element of intent.

[1] The petitioner raised two claims on direct appeal. He claimed (1) that the trial court should have granted his motion to suppress, and (2) that the prosecutor made improper comments on his failure to testify, and that reversal therefore, was required.

"The sixth amendment of the federal constitution requires that 'the accused shall enjoy the right . . . to have the assistance of counsel for his [defense]' in all criminal prosecutions." *State* v. *Barber,* 173 Conn. 153, 155, 376 A.2d 1108 (1977); see also *Levine* v. *Manson,* 195 Conn. 636, 639, 490 A.2d 82 (1985). "The right to counsel means the right to the conscientious services of competent counsel." *State* v. *Barber,* supra.

In an appeal from the denial of a habeas writ, the burden imposed upon the petitioner is higher than that imposed on him in a direct appeal. In order to succeed in a claim of ineffective assistance of counsel, the petitioner must prove: " '(1) that his counsel's performance fell below the required standard of reasonable competence or competence displayed by lawyers with ordinary training and skill in the criminal law; and (2) that this lack of competence contributed so significantly to his conviction as to have deprived him of a fair trial.' " *Valeriano* v. *Bronson,* 209 Conn. 75, 85–86, 546 A.2d 1380 (1988); see also *Strickland* v. *Washington,* 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). A reviewing court can find against the petitioner on whichever ground is easier. *Valeriano* v. *Bronson,* supra; *Nardini* v. *Manson,* 207 Conn. 118, 124, 540 A.2d 69 (1988).

In reviewing the claim, this court " 'must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under these circumstances, the challenged action "might be considered sound trial strategy." ' " *Levine* v. *Manson,* supra, 640; see also *Chace* v. *Bronson,* 19 Conn. App. 674, 678, 564 A.2d 303, cert. denied, 213 Conn. 801, 567 A.2d 832 (1989). In assessing the petitioner's claim, this court must make every effort to " 'eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged con-

duct, and to evaluate the conduct from counsel's perspective at the time.' *Strickland* v. *Washington,* supra [689]." *Levine* v. *Manson,* supra; see also *Valeriano* v. *Bronson,* supra, 87. Hence, "[i]t is possible to leave out a dispositive issue on appeal and nevertheless, to have furnished a petitioner with adequate counsel under the sixth amendment." *Valeriano* v. *Bronson,* supra.

Here, Paul Flynn, the attorney who represented the petitioner at trial and sentencing, was appointed as a special public defender and filed the petitioner's appeal. Flynn filed a preliminary statement of five issues, including the three in question here, that he intended to raise on appeal. Kevin Connors, also a special public defender, appeared in lieu of Flynn and filed an amended preliminary statement of issues, raising two of the five claims included in the original statement.

At the habeas hearing, the petitioner's appellate counsel testified that he had not reviewed the trial court file, but he had read the complete transcript of the petitioner's trial. He also testified that, while he never had reviewed the actual excluded medical reports, he had conducted preliminary research on all three issues, and he intentionally had decided not to raise those issues on appeal.

In this case, we must determine whether appellate counsel's decision not to raise the issues in question fell below the reasonable competence displayed by lawyers with ordinary training and skill in criminal law. *Levine* v. *Manson,* supra, 639; *Valeriano* v. *Bronson,* supra, 88. We conclude that the petitioner's appellate counsel did not fall below that standard.

## I

### THE MEDICAL RECORDS

At trial, defense counsel attempted to introduce medical records into evidence in order to establish that the

petitioner had a history of seizures. The existence of those records was discovered by defense counsel during the cross-examination of the state's witness Cronin. Cronin produced a statement given by the petitioner that contained a medical waiver. Defense counsel attempted to elicit testimony from Cronin concerning the waiver, but the state's objection to that testimony was sustained because it was beyond the scope of direct examination. During the defense case, counsel questioned Cronin about the waiver and attempted to introduce a medical statement obtained pursuant to that waiver relating to a 1970 treatment of the petitioner. Defense counsel attempted, for the first time, during this examination and through this statement, to suggest a history of epileptic seizures.

The trial court conducted an in camera review of the records and expressed a concern that epilepsy was beyond the ken of the average juror, and, therefore, that expert testimony would be necessary to relate the epilepsy to the defense of automation. The court stated that, without more, the records alone provided "no determination as to what the effects of these seizures are. Whether or not they restrict [the petitioner] and whether he can form an intent." It ruled that, unless defense counsel could provide a foundation to "tie in" the records to the defense, those records were irrelevant.

After the court ruled the evidence inadmissible and defense counsel excepted, the court offered to grant a five day continuance so that defense counsel could present an expert medical witness to explain and hence to lay a foundation for admission of the records. The next day, defense counsel informed the court that he was unable to contact the medical expert, and he did not offer another expert. He then agreed to go forward with final arguments.

At the habeas proceedings, Connors testified that, after reviewing the transcripts, he felt the biggest problem in raising the exclusion of the records as an issue was Judge Budney's ruling that they were irrelevant. He pointed out that, at trial, Flynn had disavowed a mental disease or defect defense, generally raised pursuant to General Statutes § 53a-13, and relied only on the defense of unconsciousness. He also testified that he knew of the difficulty involved in succeeding in an appeal from a judge's ruling on relevancy because such a ruling will be overturned only for an abuse of discretion. *State* v. *Echols,* 203 Conn. 385, 393, 524 A.2d 1143 (1987).[2]

The petitioner argues that these records not only were relevant, but were crucial to the defense because they helped to establish that his conduct was involuntary and that he could not form the specific intent. The trial court, while acknowledging that these records might contain information helpful to the defense, held that without any tie-in between the records and that defense, the records would only confuse the jury. Cf. *State* v. *Madera,* 210 Conn. 22, 32–36, 42, 554 A.2d 263 (1989) (where defendant's medical history was admitted after experts explained its contents and relationship to the case).

Connors testified that, while he did not review the records themselves before making his decision, he did review the complete transcripts. He concluded that because of the context of the exclusion and defense

[2] In *State* v. *Echols,* 203 Conn. 385, 393, 524 A.2d 1143 (1987), our Supreme Court held that "the trial court has wide discretion in its ruling on the relevancy of evidence; *State* v. *McClendon,* [199 Conn. 5, 8, 505 A.2d 685 (1986)]; *State* v. *DeForge,* 194 Conn. 392, 396, 480 A.2d 547 (1984); its rulings will be reversed if the court has abused its discretion or where injustice appears to have been done. *State* v. *Smith,* 198 Conn. 147, 157, 502 A.2d 874 (1985); *State* v. *Johnson,* 190 Conn. 541, 548–49, 461 A.2d 981 (1983); see *State* v. *Gold,* [180 Conn. 619, 646, 431 A.2d 501, cert. denied, 449 U.S. 920, 101 S. Ct. 320, 66 L. Ed. 2d 148 (1980)]."

counsel's failure to lay a foundation, the trial court's ruling on this issue was not an abuse of discretion likely to result in reversal. See *State* v. *Echols,* supra. We cannot say that this conclusion was unreasonable or fell below the requisite level of competence.

## II

### THE MOTION TO SUPPRESS

Before trial, the trial court held a hearing on defense counsel's motion to suppress bloodstained clothing and fingernail scrapings. That motion was denied. At the conclusion of the hearing, after the court's ruling that the items seized fell under the plain view exception, defense counsel orally amended his motion to suppress to include two knives seized, but he requested no further action by the court.[3]

At trial, the state's attorney questioned the petitioner's mother, Louise Russell, about one of the knives seized. Defense counsel objected to having her view this knife because she had testified that she had not seen a knife during the incident. The objection was overruled. The state next offered the testimony of the medical examiner, who indicated that the wounds were consistent with those typically caused by a smooth bladed knife. Defense counsel objected to the witness' viewing the knife because she was a medical expert and not a "forensic specialist on the size and permeations"

---

[3] At the conclusion of the suppression hearing, defense counsel made the following request to the trial court: "I would ask the court to add an item to that list so that Your Honor will understand where the list came from. The state provided me with a list of items that had been surveyed by their forensic people. In my preparation of that motion, I omitted—*the issues would be the same it seems to me. There would be no greater evidence* that would have to be done because if I fail on the issue that I raised, it seems to me that that might very well run to the other—and I'm asking permission to amend the application of motion to add that term." (Emphasis added.) The additional items referred to were the two knives and a bottle seized from within a kitchen cabinet.

of knives. That objection was sustained. The knife was then shown to the investigating officer, and, at this time, defense counsel raised his objection that the knife was a product of an illegal search and should have been suppressed.

After resolving the confusion on the motion to suppress, the trial court held a second suppression hearing to afford defense counsel the opportunity to address this issue. At this hearing, the state contested only standing. Once the trial court found that the defendant had standing to challenge the search, the state conceded that the search was conducted without a warrant or consent, and that the knives were seized from within a cabinet. After the hearing, the trial court granted the motion to suppress the knives as fruits of an unlawful search, and defense counsel moved for a mistrial based upon the fact that the jury had seen one of the knives in question.[4] The trial court denied the motion, finding that the defendant would suffer no prejudice from the continuation of the trial. The court noted that there was no question that the wounds had been caused by a knife and further noted that defense counsel had failed to raise the issue of the knives properly in his pretrial motion to suppress. During its instructions, the trial court repeatedly cautioned the jurors to disregard any suppressed evidence or testimony.

As the habeas court noted, " ' "[t]he general rule in Connecticut is that a mistrial is granted only where it is apparent to the court that as a result of some occurrence during trial a party has been deprived of the opportunity of a fair trial." *State* v. *Ubaldi,* 190 Conn. 559, 562, 462 A.2d 1001, cert. denied, 464 U.S. 916, 104 S. Ct. 280, 78 L. Ed. 2d 259 (1983); Practice Book

---

[4] Defense counsel claimed that a mistrial was necessary because the jurors had seen the knife and had heard questions about its "potential identity and its potential use." He claimed that he did not think the jurors would be able to forget about those questions and that knife.

§ 887. The ultimate question on a motion for mistrial is whether the alleged offense resulted in " 'substantial and irreparable prejudice to the defendant's case.' " *State* v. *Jennings,* 5 Conn. App. 500, 505, [500 A.2d 571] (1985) . . . .' *State* v. *McNellis,* 15 Conn. App. 416, 436, 546 A.2d 292, cert. denied, 209 Conn. 809, 548 A.2d 441 (1988)."

The petitioner argues that this claim should have been raised and would have been likely to result in reversal because one of the knives was shown to the jury and would, therefore, necessarily have caused prejudice. The petitioner relies on *State* v. *Schonagel,* 189 Conn. 752, 764–65, 459 A.2d 106 (1983), vacated and remanded, 465 U.S. 1002, 104 S. Ct. 990, 79 L. Ed. 2d 224 (1984), which holds " '[t]here is a general mental tendency [on the part of the jury] when a corporal object is produced as proving something, to *assume, on sight of the object, all else that is implied in the case about it.*' " (Emphasis in original.) He argues further that "it is reversible error for the trial court to allow into evidence articles seized from the defendant which tend to indicate criminal propensity when those articles are not connected to the commission of the crime charged." *State* v. *Wilson,* 199 Conn. 417, 449, 513 A.2d 620 (1986).

While we agree with the propositions quoted by the petitioner, those principles have no application to this case. In this case, the petitioner chooses to ignore the fact that, as found by the trial court and the habeas court, there was no doubt that a knife had been used in the homicide; the petitioner never contested that fact. His sole defense was that he was in the throes of a seizure during the act and, although he might have committed that act, he could not have formed the requisite intent to be found guilty. The petitioner would have, therefore, had a difficult task of showing how the

viewing of this knife by the jury resulted in irreparable prejudice. Therefore, defense counsel's decision not to raise this issue was not unreasonable.

## III

### THE JURY INSTRUCTION

The petitioner's final claim is that his appellate counsel should have raised the jury instruction issue. The petitioner's trial counsel submitted requests to charge on diminished capacity and on unconsciousness. The trial court refused to give either charge.

In its charge on the elements of the murder, the trial court instructed the jury that it must find that the petitioner was of sound mind at the time of the incident.[5] It then instructed the jury on the element of intent and reminded the jury that "[t]here is testimony in this case that the accused at the time of the alleged occurrence had some type of seizure. This testimony, the weight and credibility given to this testimony is within your province as the trier of fact. This testimony goes to the element of intent and it is for you to determine from all the evidence as to whether or not the state has sustained its burden of proof beyond a reasonable doubt as to the element of intent. . . . " When charging the jury on intent to commit manslaughter, the court again reminded the jury that intent must be determined from "what the circumstances were surrounding that conduct and from those infer what his purpose or intention was." The court charged that part of the jury's duty was "to draw all reasonable inferences from the conduct of the accused in light of the surrounding circumstances as to what purpose or intention was in his mind at various times."

[5] The trial court told the jury that "[a] person is of sound mind and that is legally sane and responsible for his criminal or unlawful conduct if at the time of such conduct he does not, as a result of mental disease or defect, lack substantial capacity either to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law."

Connors testified that the petitioner's defense of unconsciousness related only to the issue of intent, and that, in his opinion, the trial court gave an adequate charge on intent, capacity and seizures. His conclusion, based upon his review of the jury instructions, was that the charge covered the substance of the requests to charge as they related to the defense raised at trial and that raising this issue was not likely to result in reversal.

On appeal, a court reviewing a jury charge "must review the charge as a whole and not analyze small portions in isolation." *State* v. *Jones,* 193 Conn. 70, 90, 475 A.2d 1087 (1984). It is not improper to refuse to charge in the exact words requested. *State* v. *Shindell,* 195 Conn. 128, 143, 486 A.2d 637 (1985). " ' "The ultimate test of a court's instructions is whether, taken as a whole, they fairly and adequately present the case to a jury in such a way that injustice is not done to either party under the established rules of law." *State* v. *Harden,* [175 Conn. 315, 322, 398 A.2d 1169 (1978)].' *State* v. *McKnight,* 191 Conn. 564, 583, 469 A.2d 397 (1983)." *State* v. *Anderson,* 20 Conn. App. 271, 281–82, 566 A.2d 436 (1989). With this standard in mind, we cannot say that Connors' conclusion was unreasonable.

In conclusion, Connors testified that after reviewing the transcripts and assessing the likelihood of success on each of the issues, he made a conscious decision not to raise these three. " 'Experienced advocates since time beyond memory have emphasized the importance of winnowing out weaker arguments on appeal and focusing on one central issue if possible, or at most on a few key issues.' " *Valeriano* v. *Bronson,* supra, 89, quoting *Jones* v. *Barnes,* 463 U.S. 745, 751–52, 103 S. Ct. 3308, 77 L. Ed. 2d 987 (1983). While an appellate advocate must provide effective assistance, he is not under an obligation to raise every conceivable issue. " 'A brief that raises every colorable issue runs the risk

of burying good arguments . . . in a verbal mound made up of strong and weak contentions.' " *Valeriano* v. *Bronson,* supra, 89.

Connors selected for review those issues that he felt were the strongest and most likely to result in reversal. We conclude that this decision fell "within the range of competence displayed by lawyers with ordinary training and skill . . . ." *Levine* v. *Manson,* supra.

The judgment is affirmed.

In this opinion the other judges concurred.