[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
CT Page 5726
The petitioner was found guilty by a jury of Attempted Murder in violation of General Statutes §§ 53a-49 and 53a-54a, as well as Assault in the First Degree in violation of General Statutes § 53a-59, and sentenced to a term of twenty (20) years, execution suspended after fifteen (15) years, with a period of years probation. Am. Pet., at 1. The petitioner appealed his convictions, which were ultimately affirmed. Statev. Williams, 39 Conn. App. 18, 663 A.2d 436 (1995), rev'd, 237 Conn. 748,679 A.2d 920 (1996), on remand, 44 Conn. App. 231, 689 A.2d 484 (1997). A pro se petition for writ of habeas corpus was filed August 22, 1996, and was amended on June 21, 1999.
The petitioner, who filed the pro se petition while in the custody of the Commissioner of correction for the above-listed offenses, but now is on probation, alleges in his Amended Petition that his "conviction and resultant sentence are illegal since he was denied the effective assistance of counsel in violation of the Sixth and Fourteenth Amendments to the Constitution of the United States and Article I, Section 8, of the Connecticut Constitution in that his trial counsel: 1) failed to request a jury instruction from the court on the defense of intoxication although the evidence presented at trial clearly warranted such an instruction; and 2) failed to subpoena into evidence records of medical treatment that would have refuted the state's claim of faking emotional illness." Am. Pet., at 1-2. A trial on the merits was heard on January 2, 2002, during which testimony was proffered by the petitioner and his former trial counsel, Attorney Richard Silverstein.
"A convicted defendant's claim that counsel's assistance was so defective as to require reversal of the conviction has two components. First, the petitioner must show that counsel's performance was deficient. Second, the petitioner must show that the deficient performance prejudiced the defense. Unless a petitioner makes both showings, it cannot be said that the conviction resulted from a breakdown in the adversary process that renders the result unreliable. Stricklandv. Washington, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674, reh. denied, 467 U.S. 1267, 104 S.Ct. 3562, 82 L.Ed.2d 864 (1984); Aillon v.Meachum, 211 Conn. 352, 357, 559 A.2d 206 (1989); Fair v. Warden,211 Conn. 398, 402, 559 A.2d 1094, cert. denied, 493 U.S. 981,110 S.Ct. 512, 107 L.Ed.2d 514 (1989)." Henry v. Commissioner of Correction,60 Conn. App. 313, 316-7, 759 A.2d 118 (2000). "Even if a petitioner shows that counsel's performance was deficient, the second prong, or prejudice prong, requires that the petitioner show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the CT Page 5727 outcome." (Internal citations and quotations omitted.) Id., 317-8. Alsosee Commissioner of Correction v. Rodriguez, 222 Conn. 469, 477,610 A.2d 631 (1992).
"A reviewing court can find against the petitioner on whichever [Strickland prong] is easier. Valeriano v. Bronson, 209 Conn. 75, 85-6,546 A.2d 1380 (1988); Nardini v. Manson, 207 Conn. 118, 124, 540 A.2d 69
(1988); Magnotti v. Meachum, 22 Conn. App. 669, 674, 579 A.2d 553
(1990); Beasley v. Commissioner of Correction, [47 Conn. App. 253, 264,704 A.2d 807 (1997), cert. denied, 243 Conn. 967, 707 A.2d 1268 (1998)]."Petaway v. Commissioner of Correction, 49 Conn. App. 75, 76 n. 2,712 A.2d 992 (1998). "A court deciding an ineffective assistance of counsel claim need not address the question of counsel's performance, if it is easier to dispose of the claim on the ground of insufficient prejudice." Nardini v. Manson, supra, 207 Conn. 124.
The petitioner first alleges that his attorney "failed to request a jury instruction from the court on the defense of intoxication although the evidence presented at trial clearly warranted such an instruction." Am. Pet., at 2. "The [petitioner] never requested a jury instruction on the issue of intoxication. In addition, when the trial court inquired about the type of charge that the defendant preferred, the defendant remarked that he would not be requesting instructions on extreme emotional distress, intoxication or self-defense. The defendant requested only the standard instruction, given the crimes charged." State v.Williams, supra, 44 Conn. App. 238-9. The Appellate Court, in concluding that the trial court was under no obligation to sua sponte give an instruction on intoxication, noted that "the evidence may have suggested that a charge on intoxication may have been appropriate[.]" Id., at 239-40.
While the language from the Appellate Court's decision on remand supports the showing that must be made to overcome the first Strickland
prong, the petitioner must also show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Henry v.Commissioner of Correction, supra, 60 Conn. App. 318. "An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." Nardini v. Manson, supra, 207 Conn. 124, quotingStrickland v. Washington, supra, 466 U.S. 691.
"For example, where the alleged error of counsel is a failure to investigate the determination whether the error "prejudiced' the defendant by causing him to plead guilty rather than go to trial will CT Page 5728 depend on the likelihood that discovery of the evidence would have led counsel to change his recommendation as to the plea. This assessment, in turn, will depend in large part on a prediction whether the evidencelikely would have changed the outcome of a trial. Similarly, where the alleged error of counsel is a failure to advise the defendant of a potential affirmative defense to the crime charged, the resolution of the prejudice inquiry will depend largely on whether the affirmative defenselikely would have succeeded at trial." (Emphasis added.) Copas v.Commissioner of Correction, 234 Conn. 139, 156-7, 662 A.2d 718 (1995),quoting Hill v. Lockhart, 474 U.S. 52, 59, 106 S.Ct. 366, 88 L.Ed.2d 203
(1985).
Consequently, the petitioner in this case must show, in order to prove the second Strickland prong, that if the intoxication charge had been given to the jury, such charge likely would have changed the outcome of the trial. The evidence in this habeas corpus matter comprises transcripts of the underlying criminal trial, medical records from Yale New-Haven Hospital and Greater Bridgeport Community Mental Health Center, as well as the testimony from both the petitioner and Attorney Silverstein at the habeas corpus trial. And while there may be evidence in the record that addresses the first Strickland prong, the record is devoid of evidence that would support a conclusion that if the intoxication charge had in fact been given, that the outcome of the trial would likely have been changed to the petitioner's benefit. As a result, the petitioner's first claim fails because he has not proven that if the intoxication charge had been given to the jury, such charge more likely than not would have changed the outcome of the trial.
The second claim made by the petitioner is that Attorney Silverstein "[f]ailed to subpoena into evidence records of medical treatment that would have refuted the state's claim of faking emotional illness." Am. Pet., at 2. In his trial brief, however, the petitioner asserts that counsel failed to offer certain medical records that would have rebutted the assertion of the prosecutor that [the petitioner] had no history of mental illness." Pet'r Br., at 2. Additionally, the petitioner testified at the habeas trial that "from [his] recollection, when [Attorney Silverstein] was cross-examining — which is in the transcripts — Detective Harroway, he made mention of Mr. Williams [having] a long history of mental health, but . . . the state objected, and the judge sustained it because there was no evidence in support of that." Tr. (Jan. 2, 2002), at 17.[1] Lastly, petitioner's habeas counsel argued that the state tried to impugn the petitioner's testimony during the underlying trial by "saying he was faking a lot of the mental condition," and that the medical records which were not subpoenaed "could have been introduced to rebut those implications." Tr. (Jan. 2, 2002), at 31-2. CT Page 5729
This Court has reviewed the relevant portions of the underlying trial transcripts and is unable to identify any claim by the state that the petitioner either faked emotional illness or that he had no history of mental illness. Detective Herlihy, who was assigned to process the crime scene and was the evidence officer associated with this matter, testified regarding the collection of evidence from the crime scene. Pet'r Ex. A5, at 87.[2] Toward the end of Attorney Silverstein's cross-examination of Detective Herlihy, Attorney Silverstein inquired whether the witness had been aware that the petitioner had come from a hospital because of medical problems. Id., at 245-6. The state's attorney objected and stated that "[c]ounsel is intentionally getting into matters which he may be claiming but have not been produced through evidence through any witness who may have personal knowledge of these facts." Id. Attorney Silverstein then withdrew the question. Id. This Court was unable to locate a claim by the state in any of Detective Herlihy's testimony that the petitioner either faked emotional illness or that he had no history of mental illness.
Similarly, the testimony by the petitioner during his criminal trial contains no such claim by the state.[3] In fact, the petitioner was questioned numerous times by Attorney Silverstein regarding his mental state and how he felt. The petitioner testified at the underlying trial that he: was really distraught and depressed, and thought about committing suicide; Pet'r Ex. A2, at 65-7; felt sluggish and not in control physically; Id., at 70; felt the effects of the drugs he had been prescribed at Bridgeport Community Mental Health Center immediately prior to the offense and was depressed; Id., at 71; and had difficulty thinking and was in bad shape. Id., at 86-7. Though the state did object during the petitioner's direct testimony, there were no objections made about the testimony regarding his mental health or how he felt. The petitioner testified during cross-examination by the state that he was having a very tough time mentally and that his own mental state placed him in jeopardy, and that he needed medical attention. Id., at 118-9. There was no attempt made by the state during either direct or cross-examination to undermine the petitioner's credibility by claiming that the petitioner faked emotional illness or that he had no history of mental illness.
Another witness whose testimony is relevant to the discussion of the petitioner's second claim is Officer Belcher, who was dispatched to the petitioner's apartment the day prior to the offense date. Pet'r Ex. A, at 31. Officer Belcher was dispatched in response to the petitioner placing a 911 call after contemplating killing himself. Pet'r Ex. A2, at 65. Officer Belcher testified that he made a determination that the petitioner should be brought to a hospital for treatment. Pet'r Ex. A, at 32. This determination was based on the officer, upon his arrival, having CT Page 5730 observed the petitioner to be very despondent and sobbing uncontrollably, as well as the petitioner's statement to the officer that he was distraught. Id., at 32-4. Officer Belcher's incident report referred to the incident as a psychiatric case. Id., at 35.
The state's attorney questioned Officer Belcher on cross-examination whether or not he knew that the petitioner was telling him the truth, to which he answered in the negative. Id., at 36. Officer Belcher also testified that his categorization of the incident and his actions were based on what the petitioner had told him; Id.; and that he was not making any claims as to whether or not what the petitioner told him is accurate. Id., at 37. While this testimony underscores the fact that Officer Belcher relied on the petitioner's statements and that he did not know whether or not they were truthful, Officer Belcher did take the petitioner to a hospital for treatment and did classify the incident as a psychiatric case. Contrary to the petitioner's assertions in the second claim, the state did not claim during any of Officer Belcher's testimony that the petitioner either faked emotional illness or had no history of mental illness.
Additional testimony during the underlying trial relevant to the petitioner's second claim was given by the victim, Kyle Goodson. During cross-examination by Attorney Silverstein, Ms. Goodson testified that she was scared to let the petitioner see their son because the petitioner's "brother had killed himself and his son when his wife left him," and that she was afraid the petitioner would "have some type of emotional reaction" to being denied access to their son. Pet'r Ex. A4, at 550-1. However, Ms. Goodson then testified that she had lived on and off with the petitioner for approximately five years, during which he had never appeared psychologically unstable. Id., at 551. The state again did not claim that the petitioner either faked emotional illness or had no history of mental illness.
The last witness relevant to resolving the petitioner's second claim is psychiatrist Dr. August, an expert witness "hired [by the petitioner] . . . [to discuss] the effect that [the medications prescribed to the petitioner] would have, as well as his mental condition, on his ability to formulate the necessary intent for this crime and whether or not his condition was such, based on his emotional condition, that he could not formulate that intent." Tr. (Jan. 2, 2002), at 21-2.[4] Dr. August's testimony encompassed the medications the petitioner had been prescribed prior to the offense; Pet'r Ex. A2, at 8-15; the impact these medications could have on someone in the petitioner's mental condition; Id., at 15-18; and that the petitioner suffered from a major depressive episode prior to the offense. Id., at 34. CT Page 5731
Attorney Silverstein on direct examination specifically asked Dr. August whether he knew anything about the petitioner's history prior to the offense date and whether the petitioner had provided that history to Dr. August, to which Dr. August replied in the affirmative. Id., at 36. At no time during either direct or cross-examination of Dr. August did the state claim that the petitioner either faked emotional illness or had no history of mental illness. Dr. Werdman, a state's witness called to rebut Dr. August's testimony, primarily testified regarding the impact the medications had on the petitioner.[5] Dr. Werdman also testified that the petitioner "had presented complaining of symptoms of being depressed over a recent breakup with his girlfriend," and that his "specific chart [said] that he reported multiple somatic signs of depression." Pet'r Ex. A2, at 143-4. Once again, at no time during Dr. Werdman's testimony is there a claim by the state that the petitioner either faked emotional illness or had no history of mental illness.
This Court has undertaken a review of the relevant transcripts and finds that there is nothing in the record to support the petitioner's second claim. This Court finds that the petitioner has failed to show both that Attorney Silverstein was deficient for failing to subpoena into evidence records of medical treatment that would have refuted the state's alleged claim of faking emotional illness, nor that he was prejudiced by Attorney Silverstein's performance. In other words, the petitioner has failed to meet both Strickland prongs.
For all the foregoing reasons, the petitioner has failed to prove both of his claims of ineffective assistance of counsel. The petition seeking habeas corpus relief, therefore, is denied.
BARRY, JUDGE TRIAL REFEREE