[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
On January 28, 1998, the petitioner entered a plea of nob contendere to one count of sexual assault in the second degree in violation of General Statutes § 53a-71 (a)(1) and to one count of risk of injury to a minor in violation of General Statutes § 53-21. Resp't Ex. 4, at 1-2. The petitioner was sentenced on April 17, 1998 on each count to four years to serve, execution suspended after one year, with five years probation, to be served consecutively, for a total effective sentence of eight years, execution suspended after two years, with five years probation. Resp't Ex. 5A, at 2. In a petition for habeas corpus dated CT Page 7943 November 2, 1998, which was filed with the court on November 10, 1998, the petitioner claims that his conviction is illegal because: 1) his guilty plea was not voluntary; 2) the sentencing was illegal; 3) there was trial irregularity; 4) his attorney did not represent him properly; and 5) that "the totality of claims violates petitioner's right to fair trial and equal protection." Pet., at 3. Petitioner's counsel filed a Notice Not to Amend Petition dated November 8, 2000, which was filed with the Court on November 13, 2000.
"A convicted defendant's claim that counsel's assistance was so defective as to require reversal of the conviction has two components. First, the petitioner must show that counsel's performance was deficient. Second, the petitioner must show that the deficient performance prejudiced the defense. Unless a petitioner makes both showings, it cannot be said that the conviction resulted from a breakdown in the adversary process that renders the result unreliable. Stricklandv. Washington, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674, reh. denied, 467 U.S. 1267, 104 S.Ct. 3562, 82 L.Ed.2d 864 (1984); Aillon v.Meachum, 211 Conn. 352, 357, 559 A.2d 206 (1989); Fair v. Warden,211 Conn. 398, 402, 559 A.2d 1094, cert. denied, 493 U.S. 981,110 S.Ct. 512, 107 L.Ed.2d 514 (1989)." Henry v. Commissioner of Correction,60 Conn. App. 313, 316-7, 759 A.2d 118 (2000). "Even if a petitioner shows that counsel's performance was deficient, the second prong, or prejudice prong, requires that the petitioner show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." (Internal citations and quotations omitted.) Id., 317-8. Seealso Commissioner of Correction v. Rodriguez, 222 Conn. 469, 477,610 A.2d 631 (1992).
"Although Strickland applies generally to the evaluation of whether ineffective assistance of counsel during criminal proceedings has infringed on a petitioner's constitutional rights, the United States Supreme Court has articulated a modified prejudice standard for cases in which the conviction has resulted from a guilty plea.[1] See Hill v.Lockhart, 474 U.S. 52, 106 S.Ct. 366, 88 L.Ed.2d 203 (1985). Hill
requires the petitioner to demonstrate that he would not have pleaded guilty, that he would have insisted on going to trial, and that the evidence that had been undiscovered or the defenses he claims should have been introduced were likely to have been successful at trial." Copas v.Commissioner, 234 Conn. 139, 151, 662 A.2d 718 (1995).
"The Hill court also stated that the petitioner must show that such a decision to plead not guilty would have been based on the likelihood that the introduction of the evidence or the defense that was not identified CT Page 7944 because of ineffective assistance of counsel would have been successful at trial. The court stated that in many guilty plea cases, the prejudice inquiry will closely resemble the inquiry engaged in by courts reviewing ineffective-assistance challenges to convictions obtained through a trial. For example, where the alleged error of counsel is a failure to investigate the determination whether the error prejudiced the defendant by causing him to plead guilty rather than go to trial will depend on the likelihood that discovery of the evidence would have led counsel to change his recommendation as to the plea. This assessment, in turn, will depend in large part on a prediction whether the evidence likely would have changed the outcome of a trial. Similarly, where the alleged error of counsel is a failure to advise the defendant of a potential affirmative defense to the crime charged, the resolution of the prejudice inquiry will depend largely on whether the affirmative defense likely would have succeeded at trial." (Internal citations and quotations omitted.) Id., 156-7.
"A reviewing court can find against the petitioner on whichever [Strickland prong] is easier. Valeriano v. Bronson, 209 Conn. 75, 85-6,546 A.2d 1380 (1988); Nardini v. Manson, 207 Conn. 118, 124, 540 A.2d 69
(1988); Magnotti v. Meachum, 22 Conn. App. 669, 674, 579 A.2d 553
(1990); Beasley v. Commissioner of Correction, [47 Conn. App. 253, 264,704 A.2d 807 (1997), cert. denied, 243 Conn. 967, 707 A.2d 1268
(1998)]." Petaway v. Commissioner of Correction, 49 Conn. App. 75,76 n. 2, 712 A.2d 992 (1998). "A court deciding an ineffective assistance of counsel claim need not address the question of counsel's performance, if it is easier to dispose of the claim on the ground of insufficient prejudice." Nardini v. Manson, supra, 207 Conn. 124.
The petitioner's first claim is that his guilty plea was involuntary and "psychologically and emotionally induced through virtual abandonment of legal representation," that "Counsel's actions were . . . contrary to [the petitioner's] wishes," that counsel mysteriously failed to advise the petitioner, and that counsel was not prepared for the petitioner's defense. Pet., at 3A. The petitioner claims that these alleged failures "lead to a last minute, late and questionable entry of a plea to a lesser offense AFTER SIX YEARS OF WAITING." (Emphasis in original.) Id. The abandonment of legal representation is argued to have occurred because of counsel's failure to communicate with the petitioner. Pet'r Br., at 3.
The petitioner testified at the habeas corpus trial that when he was arraigned in 1992 on the underlying charges, Attorney Brian Carlow was his attorney.[2] Tr. (Feb. 27, 2002), at 4. The petitioner also testified that he had posted bond when he was first arrested, and thus was out on bond before his arraignment. Id., at 5. Attorney Carlow testified at the habeas corpus trial that although he had no specific CT Page 7945 recollection, he would be surprised if he had not filed the standard motions that would usually filed in a criminal case such as the petitioner's. Id., at 44. The petitioner acknowledges "that the following pre-trial motions were filed with the court: Motion for discover; to suppress evidence; for supplemental discovery; to dismiss; for a bill of particulars; for disclosure of uncharged misconduct; to preserve evidence; to suppress identification; to suppress statements of the defendant; for return of seized property; and to compel a scientific test result." Pet'r Br., at 4.
Attorney Carlow additionally testified that he moved to withdraw from the petitioner's underlying criminal matter sometime early 1995 after representing the petitioner for nearly 2 1/2 years. Tr. (Feb. 27, 2002), at 45. The petitioner's criminal matter had not resolved during that 2 1/2 year period because, according to Attorney Carlow, there was a trial list that was considerably longer than it is today and that he did not have a recollection of the petitioner wanting to get going and proceed to trial. Id., at 46-7. Attorney Carlow also testified that there were two ways a case could end up going to trial: either the case would be picked from the trial list and trial would commence, or some proactive measure, such as filing a speedy trial motion or informally advising the prosecutor or presiding judge that the case was ready for trial, would result in trial assignment. Id., at 46-7. Attorney Carlow testified that it was not his standard procedure to file speedy trial motions, but that he instead usually utilized the informal method of getting a case to trial. Id. Lastly, Attorney Carlow testified that in his thirteen-year experience as a public defender in New Haven, it is "a rare occurrence that someone is pushing trial when they're out on bond" and that he did not have a recollection of the petitioner pushing to have his case go to trial. Id., at 47 and 52.
Attorney Hopkins testified that he was appointed to represent the petitioner on March 15, 1995. Id., at 31. Attorney Hopkins recalled having numerous conversations with the petitioner regarding the charges, the potential sentences the petitioner faced and whether to plead guilty or not guilty. Id., at 32. Attorney Hopkins stated that he generally met clients "at the courthouse, unless there was some exceptional circumstance," and that he had no recollection of the petitioner coming to his office to meet with him and discuss the case. Id. Additionally, Attorney Hopkins testified that he did not recall filing any pre-trial motions in the petitioner's underlying case, but that instead he adopted predecessor counsel's motions. Id., at 38. As to the conversations he had with the petitioner, Attorney Hopkins stated that it seemed to him that the petitioner did not understand the serious nature of the charges, that he "didn't seem to comprehend the jeopardy that he was in as a result of facing these charges." Id., at 32. Attorney Hopkins testified that he CT Page 7946 very forcefully recommended to the petitioner that he plead guilty because of the very lengthy potential sentence the petitioner faced if convicted of any of the charges in the original information.[3] Id., at 33.
As already indicated, Attorney Hopkins began representing the petitioner in March of 1995 and represented him until 1998, when the petitioner entered his plea and was sentenced. Attorney Hopkins testified that the petitioner had never come to him prior to the jury selection and asked him to file a motion for speedy trial; Id., at 41; and that when it came time to begin the trial, the petitioner was reluctant to try the case and did not want to go forward. Id., at 37. Attorney Hopkins reiterated that he suggested to the petitioner "in no uncertain terms that he ought to accept a plea" to the reduced charges. Id., at 38. This recommendation was based, according to Attorney Hopkins, on his assessment of the sentence the petitioner would receive if convicted on the totality of the evidence as he knew it to exist at that point, and that the evidence at the criminal trial would ultimately be a "swearing contest between the victim and the defendant if he had chosen to [testify.]" Id.
Attorney Hopkins testified that the plea negotiations between the petitioner, himself and the prosecutor continued throughout the jury selection process. Id., at 34. After several jurors had been selected, the petitioner chose to change his plea and enter a written nob contendere plea. Resp't Ex. 4, at 2. Attorney Hopkins testified that he conveyed all the plea negotiation information to the petitioner, and when questioned whether he felt that he gave the petitioner "an adequate basis of information in order to make an intelligent decision as to whether to go forward on a trial or to tender a plea," Attorney Hopkins replied "Absolutely." Id., at 34-5. A review of the change of plea transcript shows that the petitioner indicated to the court that he had discussed with his attorney the decision to change his plea and that he was satisfied with the representation provided by Attorney Hopkins. Pet'r Ex. 4, at 2-3. The petitioner at his habeas trial testified that he did not speak to the judge at sentencing. Tr. (Feb. 27, 2002), at 20 and 22. The sentencing transcript shows, however, that the petitioner addressed the court and sought to have the court take into consideration the good behavior exhibited by the petitioner during the six years he was out on bond.[4]
At the habeas corpus trial, the petitioner testified that he felt Attorney Hopkins intimidated him and coerced him into changing his plea "by telling [him] that . . . if the judge [found] him guilty, he'll slap a million-dollar bond on me. I could pull twenty years in jail; things like that." Tr. (Feb. 27, 2002), at 6-7. The petitioner also testified CT Page 7947 that he felt that he did not have enough time prior to changing his plea to consult with Attorney Hopkins and consider all the options that were available to him. Id., at 7. Specifically, the petitioner claimed that he did not have enough time to talk to Attorney Hopkins because the petitioner "was working all the time" and that as far as he knew, none of his calls to Attorney Hopkins's office were returned. Id., at 7-8. Lastly, the petitioner admitted that he did not know how his underlying case was prejudiced by the six-year delay. Id., at 13.
"The Supreme Court of the United States and the Connecticut Supreme Court have identified four factors which form the matrix of the defendant's constitutional right to speedy adjudication: length of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant. A balancing test is to be applied on a case by case basis. None of the factors standing alone demands a set disposition; rather it is the total mix which determines whether the defendant's right was violated. The length of the delay is to some extent a triggering mechanism. Until there is some delay which is presumptively prejudicial, there is no necessity for inquiry into the other factors that go into the balance.
"Our courts have not held that any particular length of delay is presumptively prejudicial, but have stated that an extensive delay warrants an inquiry into the other factors. . . . There is no constitutional basis for holding that the speedy trial right can be quantified into a specific number of days or months. Although no exact length of time has been established to be sufficient to presume prejudice, a delay of over two years is sufficient to cause investigation into the other factors. . . ." (Internal citations and quotations omitted.) State v. Martin, 56 Conn. App. 98, 102-4, 741 A.2d 337 (1999), cert. denied, 252 Conn. 926, 746 A.2d 790 (2000).
The petitioner's first claim alleges that his confinement is illegal because counsel's failure to communicate with the petitioner resulted in abandonment of legal representation, thus rendering the petitioner's plea involuntary. Based on the foregoing, however, this Court finds not credible the petitioner's testimony that he was intimidated and coerced into changing his plea. And while the petitioner alleges failures by counsel that "lead to a last minute, late and questionable entry of a plea to a lesser offense after six years of waiting," it is the petitioner who failed to assert his right to a speedy trial and reaped the benefit of having been out on bond for approximately six years prior to changing his plea. The petitioner has neither shown that counsel's performance was deficient nor affirmatively proven that he would have succeeded at trial. CT Page 7948
The petitioner's second claim is that his sentence was illegal because the prosecutor and defense counsel failed to quickly bring this matter to trial, neglected the underlying criminal case and made the petitioner "wait about six years to have his day in court." Pet., at 3A. Consequently, the petitioner claims he should not be incarcerated at all. Id. "An illegal sentence is essentially one which either exceeds the relevant statutory maximum limits, violates a defendant's right against double jeopardy, is ambiguous, or is internally contradictory." (Internal quotation marks omitted.) Cobham v. Commissioner of Correction,258 Conn. 30, 38, 779 A.2d 80 (2001). Furthermore, Cobham requires "that, in order to challenge an illegal sentence, a defendant either must appeal the sentence directly or file a motion to correct the sentence pursuant to § 43-22 with the trial court before raising a challenge for the first time in a petition for a writ of habeas corpus." Id., at 39. The petitioner in this case has done neither, nor has he alleged or shown cause and prejudice for failure to do so. Consequently, this Court concludes that the petitioner's second claim is not properly raised in the habeas corpus petition.
The third claim in the petition alleges that there were trial irregularities in that exculpable DNA exams were never introduced, "that the presiding judge never inquired on the nature, existence or information in these DNA exams," and that there was a lack of factual evidence and witnesses to support the petitioner's plea. Pet., at 3A. At the habeas corpus trial, the petitioner testified that Attorney Carlow, who represented the petitioner from 1992 to early 1995, was present in 1993, when blood was drawn and both a hair specimen and a mouth culture were taken. Tr. (Feb. 27, 2002), at 8. The petitioner also stated that he was never furnished with testing results. Id. Lastly, the petitioner testified that he never asked Attorney Carlow what the test results were because they came in subsequent to Attorney Hopkins's appearance, that the petitioner asked Attorney Hopkins what the testing results were, and that Attorney Hopkins told him that the results indicated that the sperm found in the victim did not match the petitioner's. Id., at 9.
Attorney Carlow testified that he filed a motion to compel DNA test results and that although there were efforts made "to determine whether there was sufficient DNA in the biological sample for them ultimately to do a comparison," but that these efforts to obtain a sufficient sample failed. Id., at 44-5. The result, consequently, was that no comparison could be made between samples taken from the victim and the petitioner.Id., at 45. Attorney Carlow could not recall whether or not he conveyed this information to the petitioner, though he did recall that it was at about this time that he filed the motion to appoint a special public defender, which resulted in the appointment of Attorney Hopkins. Id. CT Page 7949
Attorney Carlow testified regarding three criminalistics reports submitted into evidence in the habeas case: 1) a criminalistics report requested on October 15, 1992 and dated March 16, 1993; Resp't Ex. 6; 2) a supplemental criminalistics report requested on November 2, 1994 and dated November 29, 1994; Resp't Ex. 7; and 3) a DNA criminalistics report requested on January 26, 1995 and dated March 22, 1995; Resp't Ex. 8. According to Attorney Carlow, the first report was produced from the sex crimes kit taken from the victim and did not include samples from the petitioner. Tr. (Feb. 27, 2002), at 49-50. The supplemental report, however, did compare samples taken from the petitioner to the victim and neither excluded nor exonerated the petitioner from being a source of the sperm. Id., at 51. The final laboratory report contains the DNA testing and shows that the tested materials failed "to yield a result to give a conclusive answer either way." Id., at 51-2.
Attorney Hopkins testified that the test results were available to him when he took over the petitioner's underlying case. Id., at 35. The test results were, according to Attorney Hopkins, "inconclusive at best." Id. Attorney Hopkins further categorized the test results as being neither inculpatory nor exculpatory and that the results would have no trial value, that they "would be equivocal." Id., at 36. Attorney Hopkins testified that he communicated these results and their import on the case to the petitioner, but that the petitioner remained under the impression that the DNA test would somehow exonerate him in spite of the fact that the DNA test was inconclusive. Id.
Based on the foregoing, this Court finds that the petitioner's claim of trial irregularity in that exculpable DNA exams were never introduced to be without merit. And as to the petitioner's claim that there was a lack of factual evidence and witnesses to support the petitioner's plea, the evidence before this Court shows that the state recited the facts supporting the plea; Resp't 4, at 6; that the victim was involved in the plea negotiation process, was aware of the intended disposition, and was willing to testify at a trial; Resp't Ex. 5A, at 1 and Tr. (Feb. 27, 2002), at 42; and that the state's potential witnesses, which included the victim, her mother and other family member, as well as the officer who investigated the matter, were available at the time the petitioner entered his plea. Tr. (Feb. 27, 2002), at 41. The petitioner has failed to prove any trial irregularity.
The petitioner's fourth claim is that Attorney Hopkins failed to properly represent him. The petitioner has expounded on this claim in section "e)" of an attachment to the pro se petition. Pet., at 3B. This Court has reviewed the petitioner's summary of the claims outlined under the caption "Attorney Representation" and finds that the fourth claim substantially restates the other claims made in this petition. The claims CT Page 7950 distinct from the remainder of the petition are that "There appears to be no investigation or [deposition] taken of the state's supposed victim witness by defense counsel or investigator" and that Attorney Hopkins failed to provide a requested "complete copy of all records of this affair from arraignment t6 sentencing so as to be able to review all and protect himself from errors as he may have found[.]" Id.
The petitioner has failed to proffer any credible evidence in support of the claim that Attorney Hopkins failed to investigate the matter or depose witnesses. This Court finds that that the petitioner has not shown that counsel's performance was deficient or that any such evidence resulting from these alleged failures likely would have changed the outcome of a trial. The petitioner's claim regarding the failure to provide a copy of the records in this matter has no relevance to a claim of ineffective assistance of counsel, for the petitioner sought the copy subsequent to sentencing.
The petitioner's final claim is that the totality of his claims demonstrates that the petitioner's right to a fair trial and equal protection were violated and rendered his conviction illegal. Pet., at 3. The petitioner, in fact, waived his right to have a trial when he entered his nob contendere plea. Resp't Ex. 4, at 3. Consequently, this Court concludes that the petitioner was not deprived of the right to a fair trial. And as to the equal protection claim, the petitioner has not offered any argument or evidence in support of such a claim. "An issue merely mentioned will be deemed abandoned." Henderson v. Commissioner ofCorrection, 66 Conn. App. 868, 869, 786 A.2d 450 (2001).
This Court has reviewed the petitioner's claims in this matter and has concluded, based upon the evidence, which includes the credible testimony given by both Attorney's Carlow and Hopkins contrasted with the less credible testimony given by the petitioner, that none of the petitioner's claims has merit as articulated in this Memorandum of Decision. The petition seeking habeas corpus relief is denied.
 ___________________ GRAZIANI, J.